WHITE MOUNTAIN APACHE TRIBE OF ARIZONA, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 22–H.

United States Claims Court.

July 14, 1992.

---

William H. Veeder, Washington, D.C., for plaintiff.

James M. Upton, Washington, D.C., with whom was Acting Asst. Atty. Gen. Barry M. Hartman, for defendant. Glen R. Goodsell, of counsel.

## OPINION

NETTESHEIM, Judge.

### INTRODUCTION

The White Mountain Apache Tribe of Arizona ("plaintiff") brought an action for damages and for an accounting pursuant to section 2 of the Indian Claims Commission Act of August 13, 1946, Pub.L. No. 79–726, § 2, 60 Stat. 1049, 1050, *as amended,* 25 U.S.C. § 70a (1976) (omitted from Code pursuant to Commission termination on Sept. 30, 1978) (the "ICCA"). This opinion resolves the remainder of the second phase of litigation between plaintiff and the Government. The first phase addressing resource mismanagement claims was tried in 1986. *White Mountain Apache Tribe v. United States,* 11 Cl.Ct. 614 (1987). Trial on the second phase of the litigation began

in December 1991 and concluded in March 1992. Three claims, involving pure accounting and mixed resource mismanagement/accounting claims, that arose from timber sales, stumpage sales, and grazing permits were litigated in December 1991. *White Mountain Apache Tribe v. United States*, 25 Cl.Ct. 333 (1992). This opinion addresses solely plaintiff's claims challenging the propriety of disbursements of tribal funds from Indian Moneys, Proceeds of Labor ("IMPL") accounts and from Individual Indian Moneys ("IIM") accounts for which trial concluded in March 1992.

## I. *Accounts at issue in this case*

### 1. IMPL accounts

Indian Moneys, Proceeds of Labor ("IMPL") accounts came into existence with the passage of the Act of March 3, 1883, 22 Stat. 582, 590, which provided, in pertinent part:

> The proceeds of all pasturage sales of timber, coal, or other products of any Indian reservation, except those of the five civilized tribes, and not the result of the labor of any member of such tribe, shall be covered into the Treasury for the benefit of such tribe. . . .

In 1887 the Secretary of the Interior received congressional authorization to use money deposited into IMPL accounts "for the benefit of several tribes on whose account said money was covered in, in such way and for such purposes as in his discretion he may think best, and shall make annually a detailed report to Congress." Act of March 2, 1887, 24 Stat. 449, 463. Plaintiff's IMPL account was established in 1897.

The IMPL disbursements at issue come from two funds: Indian Moneys, Proceeds of Labor, Ft. Apache, Arizona (the IMPL "principal account") and Interest, Indian Moneys, Ft. Apache, Arizona (the IMPL "interest account").

### 2. IIM accounts

Under Section 16 of the Indian Reorganization Act of 1934, Pub.L. No. 383, 48 Stat. 984 (1934) (current version at 25 U.S.C. § 476 (1988)) (sometimes referred to as the "IRA"), any tribe that adopted the IRA could also adopt a tribal constitution and bylaws to govern the management of its local affairs. 25 U.S.C. § 476. Plaintiff adopted the IRA on April 27, 1935. On August 26, 1938, the Secretary of Interior formally approved plaintiff's constitution and bylaws. Article I of the Constitution and By–Laws of the White Mountain Apache Tribe of the Fort Apache Reservation Arizona, Approved Aug. 28, 1938, authorized the Tribal Council to

> deposit all funds of the Tribe in an Individual Indian Moneys Account ["IIM"] of the Fort Apache Indian Agency, and to expend funds in accordance with a budget approved by the Secretary of the Interior, but expenditures up to a total sum of $1,000 in any one year may be made by the Council without approval.

The tribal IIM accounts at issue were established in 1936.

## II. *Legal standards governing the rendering of a proper accounting*

The obligation of a trustee to provide an accounting is a fundamental principle governing the subject of trust administration:

> The trustee is under a duty to furnish the beneficiary on demand all information regarding the trust and its execution which may be useful to the beneficiary in protecting its rights, and to give to the beneficiary facts which the trustee knows or ought to know would be important to the beneficiary.

G.T. Bogert, *Trusts* § 141, at 494 (6th ed. 1987).

The Government's duty to render a proper accounting of tribal expenditures is set forth in *Sioux Tribe of Indians v. United States*, 105 Ct.Cl. 725, 64 F.Supp. 312, *vacated on other grounds*, 329 U.S. 685, 67 S.Ct. 364, 91 L.Ed. 602 (1946). In *Sioux Tribe* the Court of Claims wrote

> Since the Government obligated itself in the treaty and the agreements of 1868, 1877 and 1899 to provide agencies, aid and assistance, schools, and instruction, the burden is on the defendant to show what portion, if any, of such expenses has not been assumed by it and should be

charged to the Indians. The Government cannot escape its primary obligations by including, among improper charges against the Indians, expenditures which it now says, without proof, may have been to some unknown and unascertainable extent proper charges against the Indians. The defendant is the trustee; it kept and has all the records and evidence, and it has the burden of making a proper accounting.

105 Ct.Cl. at 801–02, 64 F.Supp. at 331. Although the *Sioux Tribe* decision relied on a different set of treaties and agreements than those governing the course of dealings between plaintiff and the Government, the principle set forth in *Sioux Tribe* is applicable: The burden of establishing the propriety of disbursements from tribal funds rests with the Government. The Government may offer evidence in the nature of any acts, agreements, treaties, and understandings of the parties in order to meet its burden of demonstrating that disbursements were designed to advantage the Indian beneficiary.

As to the trustee who fails to keep proper records of his trust, it is usually stated that "all presumptions are against him" on his accounting, or that "all doubts on the accounting are resolved against him." G.T. Bogert, *The Law of Trusts and Trustees* § 962 at 20 (2d ed. 1984). The same rule applies in Indian accounting cases. *Menominee Tribe v. United States*, 118 Ct.Cl. 290, 326–27 (1951); *Sioux Tribe*, 105 Ct.Cl. at 802, 64 F.Supp. at 331; *Seminole Nation v. United States*, 102 Ct.Cl. 565, 631 (1945).

■ Finally, a trustee's duty must be exercised in accordance with equitable principles. One principle is that the trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out. *Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl.Comm. 65, 87 (1973).

1. **Burden of proof**

■ The accounting reports submitted by the Government in this case were tendered to meet defendant's initial burden of establishing the propriety of the IMPL and IIM disbursements. *See Minnesota Chippewa Tribe v. United States*, 14 Cl.Ct. 116, 122 (1987) (order on pretrial briefs). These reports carry with them a presumption of correctness, and it is plaintiff's burden to raise exceptions to the accounting reports. *See Minnesota Chippewa*, 14 Cl.Ct. at 121–22. This presumption of accuracy was adopted by the Indian Claims Commission (the "Commission"). *Sioux Tribe of Indians v. United States*, 12 Ind.Cl.Comm. 541, 549 (1963). Additionally, there is a strong presumption that government officials act in good faith and within the scope of their authority. *Andrade v. United States*, 202 Ct.Cl. 988, 997–98, 485 F.2d 660, 665 (1973).

The court gave the parties two options for proceeding with the accounting phase of this litigation. The first approach was recognized by the Commission in *Blackfeet*, 32 Ind.Cl.Comm. at 68. The *Blackfeet* approach had defendant go forward and present its report, explaining the methodology behind the preparation of the report. Next, the tribe set forth its exceptions, and defendant was obligated to show that the disbursements were sustainable. The second method was adopted by the Claims Court in *Minnesota Chippewa*, 14 Cl.Ct. at 120. Defendant was required to key expense items to vouchers and supporting documentation, including the archival materials such as authorities, workpapers, and correspondence. These analyses were presented to the tribe, thereby enabling the tribe to form exceptions. Following the presentation by defendant, the accounting was assigned a presumption of regularity, and the tribe was charged with the burden of demonstrating that challenged items were disallowable.

Because plaintiff had received copies of supporting documentation late in the production schedule, it agreed to the *Blackfeet* approach[1] that would enable plaintiff to

1. This approach did not apply to the claims which were fully litigated in December 1991

and the subject of the court's most recent opinion.

respond to the Government's accounting without having the burden shifted to it as would be the case under the *Minnesota Chippewa* method.[2] Defendant did not object to the *Blackfeet* approach, and the parties proceeded on that basis.

### 2. Test for disallowance of tribal IMPL expenditures

One of the difficulties in resolving the issues in the instant case stems from the varying interpretations urged by plaintiff and defendant of the statutory language establishing the trust relationship between the Government and various tribes. The Indian Reorganization Act, 25 U.S.C. § 155, provides:

> All miscellaneous revenues from Indian reservations ... shall be covered into the Treasury of the United States under the caption "Indian moneys, proceeds of labor", and are made available for expenditure, or for the benefit of the Indian tribes ... on whose behalf they are collected....

While it is clear that expenditures for tribal trust funds must be for the "benefit" of the tribe, the statute itself fails to define "benefit." The scope of the term "benefit" is a crucial element in the resolution of plaintiff's claims. Plaintiff urges a strict interpretation of the term. Throughout the course of the litigation, plaintiff argued for adoption of the "sole and exclusive" benefit test, which plaintiff claims is supported by the *Blackfeet* decision. On the other hand, defendant advocates a less exacting standard: An expenditure is proper if it is "reasonably calculated to provide a benefit to the tribe." *Te–Moak Bands of Western Shoshone Indians v. United States,* 23 Cl.Ct. 435, 437 (1991). Plaintiff's interpretation cannot prevail for several reasons.

First, *Blackfeet* does not require that funds expended from IMPL be for the sole and exclusive benefit of the tribe. *Blackfeet* states, rather, that the expenditures are governed by statute, "which requires merely that they be for the 'benefit' of the

Indians." 32 Ind.Cl.Comm. at 116–17. To the extent that plaintiff's interpretation of "sole and exclusive" means that the Bureau of Indian Affairs' Indian Agency on the reservation (the "agency") may not use tribal funds for administrative expenses or that expenses may not be paid for the purpose of benefitting non-tribal individuals or groups, plaintiff's standard is appropriate. However, it would be factually unjustifiable and legally insupportable to endorse an approach that categorizes any expenditures that were "reasonably calculated to benefit the tribe" as disallowable merely because they cast an ancillary or collateral benefit on others.

Second, the analysis of the integrity of a trustee's disbursements process stems from the intent of the trustee in making the disbursement. As long as the trustee is well intentioned and does not behave in a manner to waste the trust corpus, the trustee is presumed to act in good faith. *See Te–Moak Bands,* 23 Cl.Ct. at 436. The test that will be applied in this case is to examine an expenditure to ensure that it was designed to benefit the tribe at the time the expenditure was made.

The determination of what is meant by a "benefit to the tribe" impacts also on the court's findings as they relate to plaintiff's exceptions to items that plaintiff alleges were merely for the benefit of individual Indians. Plaintiff argued, primarily through its expert in Indian accounting, Paul J. Gillis, that expenditures made on behalf of individual Indians could not by definition be a benefit to the tribe. Plaintiff points to the decision in *Minnesota Chippewa,* 14 Cl.Ct. at 127, in which Judge Bruggink stated: "It is clear that expenditures must have been made for the benefit of the Tribal entity as opposed to the benefit of individual Indians...." as authority that expenditures that would not benefit the entire tribe should be considered expenditures for individual Indians and thus disallowed.

Danger inheres in the strict interpretation advocated by plaintiff. It is the

---

**2.** Additionally, the *Minnesota Chippewa* case proceeded by sampling. The parties to this case

did not choose to proceed by a sampling method.

court's view that the tribal/individual distinction that was discussed in *Minnesota Chippewa* is not dispositive on the issue of what exactly constitutes a tribal benefit. At most the tribal/individual distinction is a broad generalization of what types of expenditures are allowable or disallowable. The problem with the interpretation offered by plaintiff in attempting to distinguish between the two categories became apparent at trial. In many instances what constituted an individual, as opposed to tribal, benefit was difficult to discern. For instance, Mr. Gillis excepted to expenditures of tribal moneys disbursed for the purpose of operating local movie houses on the Fort Apache Indian Reservation. The reason why this expenditure constituted an individual benefit, opined the witness, was that too few people actually benefitted from the entertainment. Mr. Gillis' categorization and subsequent disallowance of numerous expenditures as being individual rather than tribal was premised in large part on the total number of individuals benefitting from a disbursement. At first blush this seems a palatable approach. However, this approach shows its lack of precision in two different instances. First, as the number of individual Indians benefitting from an expenditure increases, the benefit may become more tribal and less individualized, despite the fact that not all members of the tribe will enjoy the benefit. Second, as expenditures on behalf of individual Indians give rise to distinct ancillary benefits for the tribe, it is difficult to accept that tribal/individual benefit classification and find that expenditures for individual Indians might not also constitute a benefit for the tribe.

As to the first scenario, the evidence at trial demonstrated that only in rare instances would a benefit be enjoyed by every member of the tribe. Plaintiff cited a number of examples where rations ideally destined for each member of the tribe failed to reach large numbers of Indians because of the inadequate roads and distribution networks. Although many members of the tribe did not enjoy the particular benefit, the intended tribal benefit is not lessened thereby, so this type of expenditure should not be relegated to the individual benefit disallowance category. The court rules that when the members of the tribe have access to a particular benefit, or a like-kind benefit, it is fair to categorize the expenditure as constituting a benefit to the tribe.

Defendant has offered guidance to the court in explaining how benefits to individuals might be construed as beneficial to the tribe by citing the decision of the Commission in *Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 39 Ind.Cl.Comm. 446 (1977). In that decision the Commission found that expenditures were proper for (1) transportation of insane Indians; (2) individual Indian livestock enterprises; and (3) individual Indian farming enterprises. The Commission discussed, among other things, the disbursement of funds for "pay of laborers," who engaged in farming and livestock activities. The Commission stated:

> With regard to plaintiff's livestock operations the evidence shows that although the tribe itself did not maintain herds as an enterprise, the tribe did assist the individual allottees in their livestock operations to enable them to become stockraisers. The evidence shows that defendant paid laborers in furtherance of this tribal program for cutting and hauling fence posts, and wire, to fence bull pastures; for roundups; for castrating stock; cooking for riders in the roundup; cutting and hauling hay, hauling feed and shucking corn.

39 Ind.Cl.Comm. at 473. With respect to pay for herders and stockmen, the Commission concluded:

> Defendant's exhibits show that the Indians were engaged in stockraising, that the government had a policy encouraging and teaching them, and that the disbursements were related to the tribal interest. We therefore, conclude that there is not a basis in the evidence for granting a motion for summary judgement as to this expenditure.

*Id.* at 477. The Commission also addressed the pay of farmers:

In its response defendant has shown that the main duties of the farmers in this case were to advise the Indians as to the proper rotation of crops, the proper method for preserving and testing seeds, the proper management of farm equipment and implements, and the best methods of farming generally in that area of the country. The farmer was also in charge of the demonstration farm [—] an experimental farm operated for the sole benefit of the tribe. All of these activities are educational or related to the tribal interest. There is not a basis for granting summary judgment with regard thereto. *See Blackfeet, supra,* 118.

*Id.* at 477–78.[3]

Plaintiff's response to defendant's reliance on *Fort Berthold* is chiefly that *Fort Berthold* represents the resolution of a motion for summary judgment. Although this is true, the Commission's decision nevertheless establishes that payments to individual Indians may be a benefit to the tribe if such payments are "related to the tribal interest."[4]

■ The court discerns no other standard that addresses both the concerns of this plaintiff and other Indian tribes that individual expenditures are prima facie disallowable, while ensuring that the Government may still rebut the exceptions set forth by demonstrating that the expenditures for individual Indians were intended to provide a tribal benefit. A benefit is allowable as a benefit to the tribe when it is related to the tribal interest in that it (a) is intended to confer a primary benefit on the members of the tribe; or (b) is intended at the time of the expenditure to provide a distinct secondary benefit to the members of the tribe in furtherance of tribal goals or policy, although the initial beneficiaries may be individual members. Under this approach an expenditure that was directed at certain individual members of the tribe, such as laborers, for instance, would be allowable if in disbursing the funds the Government did so in order to support distinct tribal programs or policy, such as, in the case of *Fort Berthold,* providing education and support for individual enterprise to its members. As in the case of virtually all other expenditures, the identity of the recipient provides only partial guidance in determining the propriety of an expenditure. The purpose of the expenditure fills in the missing piece of the puzzle that establishes whether an expenditure was intended to benefit the tribe, either directly or in an indirect way, in furtherance of a tribal program or policy. This standard would seem in line with the *Blackfeet* decision, which stipulates that expenditures must be for the benefit of the tribe, while recognizing the earlier Commission decisions in *Sioux Tribe* and *Fort Berthold.*

It is amply clear that despite the differing interpretations of what constitutes a tribal benefit proposed by plaintiff and defendant, the Government is not an insurer, and, therefore, expenditures from tribal funds are not required to result in actual benefit. At the same time, even if an expenditure relates to a tribal benefit, the purpose of the expenditure may not be so loosely related to tribal benefit that it is viewed as an injudicious expenditure. *See Te–Moak Bands,* 23 Cl.Ct. at 437 (expenditure related to tribal interest disallowable if expenditure imprudent enough as to waste tribal assets).

## DISCUSSION

I. *Disbursements from tribal IMPL accounts*

1. Defendant's accounting witnesses

Three witnesses for defendant were involved with the preparation of a July 31,

---

3. In addition to the findings made by the Commission as they related to the disbursement of IMPL funds, the Commission also found that the disbursement of tribal funds, pursuant to an 1886 agreement, for the purchase of lumber to provide furniture for individual Indian allottees was a proper expenditure. 39 Ind.Cl.Comm. at 459–60.

4. *See also Sioux Tribe of the Standing Rock Indian Reservation v. United States,* 37 Ind.Cl. Comm. 107, 111 (1975). The Commission held that expenditures of tribal funds for the education of individual tribal members were not *per se* improper. The Commission, in resolving *Fort Berthold,* relied in part on that decision to determine that expenditures of IMPL funds for education of individual tribal members were proper. 39 Ind.Cl.Comm. at 452–53, 478.

1975 GSA Indian Trust Accounting Division, Office of Finance Disbursement Accounting Report (the "1975 GSA Report"). This report was a supplemental accounting to another GSA Accounting Report dated November 6, 1970 (the "1970 GSA Report"). Their testimony afforded the court a solid perspective on how these accounting reports were prepared.

Richard H. Zimmerman, a supervisory operating accountant branch chief of the Office of Finance of the General Services Administration ("GSA") testified on the subject of the preparation of the 1970 and 1975 GSA Reports. Mr. Zimmerman was employed for more than 11 years in the Indian Trust Accounting Division (the "ITAD") of GSA, also as a supervisory operating accountant and branch chief. In this position Mr. Zimmerman was a chief liaison with the accountants and representatives from the Department of Justice, who were supervising the detail work on accounting reports that being filed in response to orders from the Commission. Specifically, Mr. Zimmerman worked with cases involving alleged improper disbursements of IMPL funds. As a result, he testified, he became familiar with the contemporary auditing process that governed the analysis of disbursements of tribal funds generally, including IMPL funds. Based on his experience, Mr. Zimmerman was qualified by the court as an expert in the field of accounting for Indian trust funds.

Working under Mr. Zimmerman's direction was Norman H. Richards, a systems accountant in the Office of the Comptroller at GSA. Mr. Richards is a certified public accountant, who held the position of a section chief at the ITAD of GSA. He has served in a supervisory capacity on other Indian cases, as well. He worked on the 1975 GSA Report from 1973 until it was issued. Mr. Richards had responsibility for identifying the vouchers and related documents that would be reproduced in the 1975 GSA Report. Mr. Richards was qualified by the court as an expert witness in accounting with a special expertise in accounting for Indian trust funds.

Defendant's third witness was Janet A. Erbacher, an operating accountant with GSA since 1985. For the last three years, Ms. Erbacher has held the position of supervisory operating accountant. In addition to experience with other Indian accounting cases, Ms. Erbacher has worked on this case since 1986. Ms. Erbacher supervised the effort coordinating the categorization of IMPL and IIM vouchers and supporting documentation. She assembled the letters, authorities and other supporting documentation to rebut plaintiff's IMPL and IIM claims.

## 2. Preparation of the GSA accounting reports

Mr. Zimmerman testified as to his role in the preparation of the 1975 GSA Report. He first became involved with the preparation of the report when the case was brought to his attention in May 1973. Initially, Mr. Zimmerman and his staff had been charged with performing a post–1951 accounting, but the relevant period was later changed to encompass an accounting up until 1946. Mr. Zimmerman testified that initially the idea of providing a supplemental accounting encompassed securing the vouchers to support the report that the GSA was filing. The method employed in the early days of preparation of Indian accounting reports had been a sampling method.

According to the witness, in late 1973 work had stopped on the report for this case.[5] He explained that most of his staff had been diverted to work on the *Blackfeet* case. Then, when the Commission handed down the *Blackfeet* decision, the opinion altered entirely the way an accounting was to be rendered. The first difference pointed out by Mr. Zimmerman was that rendering an accounting post-*Blackfeet* required the Government to report all income, including specific sources of income, a prac-

---

**5.** At the time Mr. Zimmerman initially worked on this report, it included both the San Carlos and Fort Apache reservations.

tice that had not been demanded in the past, as a means of demonstrating the path by which monies were received in and disbursed from tribal accounts. The attempt to demonstrate support for all expenditures resulted in a practice whereby all documentation, not merely a sampling of documents, was produced to back up the disbursement vouchers. Mr. Zimmerman testified that the supporting documentation was regularly filed as exhibits to buttress the accounting reports, much the same as in the instant case. According to the witness, as a result of *Blackfeet,* he developed a new approach to perform the accounting in this case, which included piecing together the supporting documentation for the disbursement vouchers. While this case involved disbursements of larger sums of money, Mr. Zimmerman testified that the complexities of rendering an accounting in this case were no greater than in a number of other Indian accounting reports in which he had participated. Mr. Zimmerman identified the three GSA accounting reports for the accounting phase of litigation—the 1970, 1975, and 1988 GSA Reports. The 1975 GSA Report was prepared under his general supervision.

The 1970 GSA Report was prepared by the Indian Tribal Claims Branch of the GSA, and was issued on November 6, 1970. The Indian Tribal Claims Branch, which began operations in 1973, was the predecessor to the ITAD of GSA. The 1970 GSA Report provided an accounting of disbursements and receipts of certain tribal funds established on behalf of the White Mountain Apache Tribe. These funds were Indian Moneys, Proceeds of Labor, Ft. Apache Indians, August 10, 1898, to June 30, 1951; Interest on Indian Moneys, Proceeds of Labor, Ft. Apache Indians, January 9, 1931, to June 30, 1951; Proceeds of White Mountain Apache Lands for 1914; and Interest on Proceeds of White Mountain Apache Lands, January 31, 1930, to March 9, 1951.[6]

Both Mr. Richards and Ms. Erbacher testified that the structure of the 1970 GSA Report was basic. The 1970 GSA Report

consisted of statements summarizing expenditures, as well as receipts. The statements of each fund were supplemented with listings of disbursements categorized by the type of expenditure. The 1970 GSA Report did not include any documentation supporting the expenditures, such as authorities or vouchers. It provided no administrative records that would establish the nature of an expense as beneficial to the tribe.

Messrs. Zimmerman and Richards testified that in March 1974 the Commission directed the preparation of a supplemental accounting report to the 1970 GSA Report. Largely, the direction for this supplemental accounting arose out of the *Blackfeet* requirement that the Government make a full accounting to the tribe of any funds handled by the Government from any reservation source. The supplemental accounting report was also to include an accounting of disbursements from these funds.

In order to satisfy the Commission's order of March 1974, the ITAD began preparing an entirely new accounting report. This report included all receipts and disbursements noted in the accounts managed by the government agents at both the Fort Apache and San Carlos reservations.[7] The ITAD culled all workpapers and documentation relating to the tribes in order to create the supplemental report. Ultimately, the ITAD utilized the documentation from the original 1970 GSA Report in order to identify which accounts contained vouchers supporting disbursements. The culmination of these efforts was the production of the 1975 GSA Report.

All three witnesses described the report's structure. Ms. Erbacher testified that as rendered, the 1975 GSA Report was broken down into three distinct parts: summaries of receipts and disbursements from tribal and non-tribal funds; workpapers listing every receipt and expenditure; and supporting documentation, including authorities and other back-up documentation found in the National Archives.

---

6. These last two funds are not at issue.

7. The San Carlos Apache Tribe is no longer a party to this litigation.

In the 1975 GSA Report, the first section on summaries of receipts and disbursements from tribal and non-tribal funds, was itself divided into three parts. The first part comprehended summaries of expenditures and receipts for both tribal and non-tribal funds contained in the workpapers. Included in this report were details distilled from the vouchers and official documents, as well as authorities and other records found in the National Archives. The second part addressed funds of the San Carlos Tribe and contained annual summaries of collections recorded and credited on behalf of the San Carlos Tribe in ledgers of the Treasury and accompanying workpapers. The third part presented similar information for the White Mountain Apache Tribe.

Ms. Erbacher testified that a Schedule of Disbursements of plaintiff's funds identified an expense with what is termed a "cost center," or major program area. The second part of the classification denoted the type of expense, otherwise known as "expense category," such as labor or purchase of materials. When no method of allocation was available for a particular disbursement because it applied to several categories, the expense was charged to a cost center called "Distributable Program Costs." This cost center also was designated for any expenses for which the documentation was scant enough to prevent the GSA accountants from being able to ascertain which cost center should apply.

### 3. Plaintiff's witness

Plaintiff's expert witness Mr. Gillis was qualified as an expert in accounting with a special expertise in accounting for Indian trust funds. Mr. Gillis had testified in the first phase of this litigation in 1986 and has been indispensable to plaintiff throughout the course of the litigation. He served in numerous capacities—as an expert in accounting and also as an experienced analyst of historical documents describing the activities on the reservation that related to the expenditure of funds. Mr. Gillis was

plaintiff's only witness on the IMPL and IIM claims in this litigation.[8]

### 4. Mr. Gillis' alternative approach

■ Mr. Gillis takes exception to the 1970 and 1975 GSA Reports and details their deficiencies in his expert report. He maintains that the reports are deficient because neither the reports nor the underlying records disclose the extent to which expenditures were made to discharge the Government's obligations, as opposed to benefit the tribe, based on standards established in *Sioux Tribe*, 105 Ct.Cl. 725, 64 F.Supp. 312. *See supra* page 449. In his expert report, Mr. Gillis cites numerous indications of this practice. For example, a letter dated February 25, 1929, from the Comptroller General of the United States, reporting to Congress on the use of tribal funds stated:

> Special reports were submitted by the investigators covering the accounting conditions prevailing and other specific matters to which their attention was directed. From the classification of expenditures reported it appears that "Indian moneys, proceeds of labor," the use of which is authorized in the appropriation acts for the benefit of the Indians, are being used for purposes similar to those provided for in gratuitous appropriations, including administrative expenses. It would appear that numerous expenditures are being made from these funds and also for items which may not be properly chargeable against the gratuitous appropriations.
>
> . . . .
>
> Except that per capita payments are made therefrom, there is no great difference between the present use of tribal funds, or funds having treaty sources, and "Indian moneys, proceeds of labor." The greater part of general agency expenses are at some agencies met from these funds and in the past, roads, bridges, irrigation canals, and similar project construction costs have been

---

**8.** Plaintiff presented another witness, Dr. Joe C. Elliot, an expert in botany and range management, who testified on plaintiff's grazing claim during the December 1991 trial. Since this claim was fully litigated and decided, Dr. Elliot's testimony is not addressed in this opinion.

charged thereto. The absolute control and almost indiscriminate use of these funds, through authority delegated to the several Indian agents by the Commissioner of Indian Affairs pursuant to section 463, Revised Statutes, is apparently causing complaint on the part of groups of Indians.

During the Hearings before the Subcommittee of the House Committee on Appropriations on the Interior Department Appropriations Bill for 1934, BIA Commissioner S.M. Dodd declared that the need for gratuity funds arose when tribal monies were expended for administrative purposes:

> The Fort Apache Reservation in central Arizona is inhabited by approximately 2,705 members of the Apache Tribe and contains 1,922,000 acres of land, none of which has been allotted. It is estimated that sufficient money will accrue from tribal grazing leases and permits to allow setting up the amount requested, the income last year having been about $23,-000. It became necessary to obtain a deficiency gratuity appropriation for 1932 to compensate for diminished tribal revenues. Prior to that time nearly all agency administrative expenses were charged against tribal revenues.

Hearings Before the Subcommittee of the House Committee on Appropriations, 72d Cong., 2d Sess. 949 (1934). The following year, during the hearings on another appropriations bill, Secretary Vincent Colyer made the following statement to Representative Hastings:

> Mr. Collier [sic]: Mr. Hastings, it has been brought out that the increase in this item is due to the supplying of gratuity money where previously we have been using tribal funds, because the tribal funds have been exhausted. It seems that our practice has been, and still is, that as long as there are tribal funds, we are going to use them for Indian bureau administration upkeep. When the funds are all gone, then we quit and put the charge onto a gratuity basis.
>
> We draw no distinction between capital and income of these funds. We are us-

ing tribal capital for current administration, and it has gone on always. We have probably used $100,000,000 of tribal capital in that way since 1900.

> A great many funds have been totally exhausted. All the funds have been depleted, and I think we are unanimous in the Indian Office in feeling that it is improper and little short of immoral to take these trust funds and apply them in this way to current maintenance, including Indian Bureau salaries.

Hearings Before the Subcommittee of the House Committee on Appropriations, 73rd Cong., 2d Sess. 662 (1935).

Mr. Gillis also maintains that the 1970 and 1975 GSA Reports do not attempt to distinguish between expenditures made out of principal and those made out of income. Moreover, the reports do not disclose that large sums disbursed from the IMPL accounts benefitted the Government or others and not members of the tribe, according to Mr. Gillis. Mr. Gillis faults the reports for failing to disclose that a determination of benefit to the tribe cannot be ascertained from many of the underlying records. He takes exception to the reports in that they do not disclose that IMPL monies were used to benefit specific identifiable groups within the tribe and not the tribe itself. Finally, Mr. Gillis states that the reports were prepared without the benefit of the Government's own correspondence and other underlying documentation, which, had they been utilized, would have made clear the purpose for which plaintiff's IMPL funds were disbursed and the benefits derived from the disbursements.

In attempting to test the validity of the GSA accounting reports, Mr. Gillis and his staff examined each individual voucher. Mr. Gillis fashioned the bulk of his exceptions to IMPL disbursements based on a series of code designations that he used to classify the basis for disallowing an expenditure. The IMPL disallowance codes used by Mr. Gillis in what was referred to as his "alternative approach" are, as follows: [9]

---

**9.** In virtually every expense category, plaintiff's reasons for excepting to disbursements were

Code 1—"Agency"—This code was used to indicate an expenditure that plaintiff categorized as disallowable for serving an administrative purpose or otherwise benefitting the agency and not the tribe. Mr. Gillis frequently applied the code when he saw the term "agency" on a voucher;

Code 2—"Illegible"—A document was assigned this code when it was either completely illegible or Mr. Gillis's staff was unable to read line items on the disbursement vouchers;

Code 3—"No Indication of Purpose"—A voucher was given this disallowance designation where no purpose was indicated by the voucher;

Code 4—"Missing Voucher"—This disallowance code was employed when vouchers were lost or otherwise unavailable;

Code 5—"Individual Benefit"—Mr. Gillis utilized this code when a benefit was provided but the quantity or amount was of such size that there was not, in his opinion, a tribal benefit;

Code 6—"Multiple purposes"—This code was used to designate expenditures which served several purposes that could not be segregated or apportioned;

Code 7—"Colyer/Govm't Obligations"— This code was used to designate a purchase that plaintiff considered was the obligation of the Government to provide to the tribe, regardless of whether the purchase was beneficial; [10]

Code 8—"Refund"—This code designated a refund.

Code 9—"Not a tribal benefit"—This code was employed as a catch-all disallowance code when no tribal benefit was discernable from the voucher.

Certain among these disallowance codes designated defects arising from the quality of the documentation itself (Codes 2, 3 and 4). Other codes were applied to disallow expenditures based on the nature of the expenditure itself (Codes 1, 5, 6, 7, 8, 9). *See generally Red Lake Band v. United States*, 17 Cl.Ct. 362 (1989) (Claims Court sampling analysis based in part on what that court referred to as "Gillis Exceptions.").[11]

Defendant argues that Mr. Gillis' "alternative approach" is flawed and is wholly unreliable. After considering all of the evidence, reviewing all relevant pleadings, and examining the vouchers and other accounting materials relied on by plaintiff to substantiate its exceptions, the court agrees that the "alternative approach" is seriously flawed, except in two respects. The two categories for illegible and missing vouchers are sound. However, while analysis of the accounting documents supporting expenditures from tribal funds demonstrates that there is some basis for excepting to disbursements on the other grounds that Mr. Gillis explained during his testimony, by and large, in addition to evidencing numerous inconsistencies, plaintiff's method of coding the IMPL vouchers is premised on a defective methodology. Significantly, plaintiff's coding approach did not provide for any codes that would permit the coders assisting Mr. Gillis to identify an expenditure as one for the benefit of the tribe. Mr. Gillis testified that the tribal benefit was taken into account by virtue of the fact that several of the categories, such as Colyer Obligation (Code 7) and Tribal v. Individual (Code 5), might include expenditures that the court could rule were allowable as a tribal benefit. To

those represented by disallowance codes developed by Mr. Gillis. When other significant reasons for disallowing expenditures were set forth, they will be noted.

10. Plaintiff contends that under an agreement entered into between Secretary Colyer and plaintiff that resulted in plaintiff's relocating onto the reservation, the Government assumed certain obligations to provide for plaintiff's subsistence, education and general welfare. *See* discussion of Colyer Agreement *infra* pp. 463–68.

11. Plaintiff's expert witness Mr. Gillis worked as the accountant for the plaintiff Red Lake Band in this case. Expenditures were challenged under a coding mechanism similar to the method utilized by Mr. Gillis in the instant matter. In *Red Lake Band,* however, the "Gillis exceptions" were based on 23 numerical codes rather than the 9 codes used in the instant case. 17 Cl.Ct. at 371. The Gillis exceptions in *Red Lake Band* challenged more than 98 percent of the $4,000,-000 at issue. *Id.*

Mr. Gillis' credit, he testified that he did not believe that it was his place to make a final determination on the fine-line determinations inherent in these categories, which is why he set them out as separate categories. Although the court agrees with Mr. Gillis on the difficulty inherent in identifying and separating out tribal benefit, should any exist in these two categories, an approach cannot be countenanced that begins with the premise that any voucher is to be coded in a manner that either prejudges its disallowance or is suggestive of disallowance. Based on its review of the evidence, the court deems untenable plaintiff's position that there could be no expenditures, save the per capita expenditures conceded by plaintiff as proper, that were for the benefit of the tribe.[12] This flaw in plaintiff's case stems from the "sole and exclusive benefit" test that plaintiff repeatedly has advocated and that has been rejected as not sustainable in fact or law.

Even though plaintiff's overall methodology is unreliable, the court does not adopt defendant's view that the lack of experience of the coders assisting Mr. Gillis in what was nothing short of a Herculean effort is ultimately responsible for coding flaws that might have been averted had more experienced coders been used on the coding. Mr. Gillis' own testimony on cross-examination highlighted the difficult task of designating the disallowance category in which an expenditure should be placed. On occasions too numerous to mention individually, counsel for defendant presented Mr. Gillis with vouchers that previously had been coded by Mr. Gillis or one of the other coders, but which had the assigned code redacted. Counsel for defendant asked Mr. Gillis to identify how the voucher should have been coded or how he would have coded the voucher had he coded it. In almost all instances, the code that Mr. Gillis stated he would have used differed from its actual designation code. Moreover,

many vouchers that Mr. Gillis and his staff had coded 3, "No Indication of Purpose," evidenced a readily ascertainable purpose. During trial plaintiff would not stipulate to inconsistencies in the coding methodology. Consequently, the court examined vouchers from virtually every cost center at issue in this case and found the inconsistencies pervasive. The court is unwilling to accept defendant's implication that plaintiff's coding staff deliberately shirked its responsibility to exercise good judgment in the coding process; however, the evidence fully supports a finding that the coding errors severely undermine the credibility of the Gillis methodology.

Mr. Gillis attempted to explain the discrepancies by pointing out that even if a voucher had been miscoded, as long as it was disallowable, the category to which it was assigned did not matter: The result would have been the same—disallowance. This rationale cannot be accepted for several reasons. First, it is an unjustified assumption that expenditures are automatically disallowable under several rationales; the heart of the Gillis alternative approach is the assertion that the vouchers can be disallowed under 9 different codes. While from time to time a voucher might be disallowable as, for example, an agency expenditure or an illegible voucher, in many cases only one disallowance code might apply. Were plaintiff unable to fit the expenditure into that disallowance code, the expenditure would otherwise be allowable. Mr. Gillis himself testified that the coding errors uncovered might have impacted on his conclusion that almost all IMPL disbursements should be disallowed. According to the witness, this would be the case if the issues concerning the existence and scope of any Colyer Obligation, obligations arising under what is referred to in this opinion as the "Colyer Agreement," see infra 463–68, as well as the issue of whether monies spent for the benefit of individual Indians might be beneficial to the tribe, were re-

12. Per capita payments in the amount of $78,310.00 were made to members of the tribe during 1922 and 1926. The tribe requested that money be disbursed for the purpose of easing the impact of an economic depression, declining livestock prices, and a generally faltering farm industry. Mr. Gillis testified that he believed that these were the only IMPL disbursements that were not objectionable.

solved against plaintiff. In other words, in the event that the court disallowed all of the categories it was, in plaintiff's view, immaterial that the vouchers were improperly coded. If the court allowed some categories and disallowed others, however, the specific codes would have much more significance because a voucher would be either allowed or disallowed depending on the category into which it was placed.

For example, if it were determined that the Government was not obligated to provide funds for specific purposes beneficial to the tribe after 1925 under the Colyer Agreement, the amount of IMPL expenditures disallowable under the Gillis alternative approach would be reduced by approximately $380,000.00 for those expenditures that had been placed into the Code 7, "Colyer Obligation." Additionally, given Mr. Gillis' testimony that vouchers coded 3, "No Indication of Purpose," might actually have a purpose that might also be found to benefit the tribe, the flaw in his methodology might increase the level of allowable expenditures to well over $750,000.00.

Trial uncovered other defects in the methodology of Mr. Gillis' alternative approach. A significant defect is Mr. Gillis' interpretation of the term "agency" on vouchers that he subsequently disallowed as "agency" expenditures. Mr. Gillis testified that whenever he saw the words "Ft. Apache Agency" on a voucher, he concluded that any benefit was for the exclusive benefit of the Government and should be disallowed, and he coded the expenditure as Code 1. Defendant, however, presented many examples of vouchers on which the term "agency" signified an expense that was not an expense to benefit the Government. For example, a June 12, 1937 letter to Superintendent William Donner discussed the use of funds to establish the tribal cattle herd. In that letter Commissioner Dodd wrote:

With regard to the suggestion in your letter of May 10 relative to the similarity of a method you propose for handling the proceeds of the tribal herd to that used in the sawmill enterprise, we would call your attention to an important distinction. The tribal herd has been operated as a tribal enterprise and, in fact, is a tribal activity; whereas the sawmill was set up as an agency project for the benefit of the Indians.

By reason of the authority contained in the Act of May 17, 1926, 44 Stat. 560, revenues derived from Indian reservation schools and agencies may be deposited into the Treasury as Indian monies, proceeds of labor, agency. Thus, the funds derived from the agency activity of the sawmill may be deposited to this fund; while the tribal herd may be operated by agency personnel insofar as the actual care and handling operations are concerned, it is not operated as an agency activity in the strict sense of the word.

This letter demonstrates how vouchers for disbursements citing an "agency" purpose might designate, in fact, an agency project for the benefit of the tribe. The reason for this inconsistency can be attributed to the indisputable facts that sometimes the reservation was referred to as the "agency" or that supplies and provisions were shipped and delivered to the administrators of the reservation. Because expenditures disallowed under Code 1 of the Gillis alternative approach represent $1,510,446.99 of IMPL disbursements excepted to by plaintiff, this error significantly undermines plaintiff's conclusion that 97.62 percent of all IMPL disbursements should be disallowed.

Plaintiff's most serious error in respect of its IMPL claim was the failure to utilize IMPL authorities in its review of disbursements. Indeed, the December 1991 trial was continued for one week in March 1992 for the express purpose of permitting plaintiff additional time to examine the authorities in order to permit Mr. Gillis to reconsider his exceptions to the Government's accounting. The first major colloquy between counsel for plaintiff and the court in the accounting trial addressed this specific point. Plaintiff's counsel claimed that he had only been provided with the authorities a few weeks before the December trial, and the court granted plaintiff the continuance in order to avoid prejudice to plaintiff.

When Mr. Gillis was questioned as to why he had not reviewed the authorities during the recess between the December and March sessions, the witness responded that he did not think the March trial was to include the IMPL claim. Mr. Gillis stated he had not read the order entered on December 13, 1991, stating that the IMPL and IIM claims would be concluded during the March session.

Mr. Gillis' statement about his responsibility regarding the IMPL authorities is not questioned. At the same time, the court cannot allow his misunderstanding to inure to plaintiff's benefit. It is not Mr. Gillis' responsibility to read court orders. The responsibility rests squarely on plaintiff's counsel's shoulders to direct his staff and his witnesses to address the issues that have been designated for trial.

Most important of all, the failure to examine the authorities may have had a dramatic outcome on conclusions drawn about the disallowability of expenditures. Ms. Erbacher's testimony during the March 1992 session established that authorities are essential in many instances to identify the purpose of an expenditure. Many of the vouchers consist of a cursory entry of the name of the purchase, with nothing more than an authority cited in support. Upon examining the authority, however, the purpose is revealed and the expenditure properly can be classified allowable as a benefit to the tribe. Plaintiff has implied throughout the course of the trial that it is not plaintiff's obligation to wade through the voluminous authorities presented to it in an attempt to make sense of the vouchers. This position is rejected. It was incumbent upon plaintiff, when presented with viable evidence of potentially proper expenditures, to review the documentation in an attempt to ascertain the nature of the expenditures for which disbursements were made. The volume of the documents themselves is of no moment.

Plaintiff cries foul and relies on the *Blackfeet* decision for the proposition that the accounting must be set forward in such a manner so that the beneficiary will be able to "readily ascertain," 32 Ind.Cl. Comm. at 87, how the trust was carried out. Plaintiff implies that the volume of documents itself defeats the readily ascertainable standard announced in *Blackfeet*, see 32 Ind.Cl.Comm. at 100, 107. It is evident that *Blackfeet* did contemplate a requirement that the beneficiary study supporting documentation as a means of ascertaining whether the trust had been carried out. In *Blackfeet* defendant was required to "produce such vouchers, reports, or other proof as [was] available." 32 Ind.Cl. Comm. at 87; see also *Red Lake Band*, 17 Cl.Ct. at 373–74 (36 boxes of backup documentation important to understanding of expenditures in retrospective accounting). With respect to the IMPL disbursements, plaintiff has not undertaken this effort. Because plaintiff failed to consider available accounting documentation in connection with litigating its exceptions to defendant's accounting and because the methodology underlying Mr. Gillis' alternative approach is unreliable, plaintiff's suggested alternative accounting approach cannot be accepted as more reliable than the method that defendant adopted.

Incident to trial defendant conceded a substantial dollar amount of expenditures that are disallowable based on the type of disbursement made. Mr. Gillis' approach is not entirely without basis. Although in many cases the court found vouchers that had been coded as "agency" expenditures, but on which the term "agency" apparently was used merely to designate the reservation, vouchers for agency expenditures have been found that defendant heretofore had not conceded as disallowable. However, the court, in the face of the flaws in plaintiff's alternative approach, cannot award plaintiff damages based on its characterization of expenditures. As to the codes that categorize a disbursement as disallowable based on the type of disbursement (Codes 1–Agency, 5–Individual, 6–Mixed Purpose, 7–Colyer/Government Obligation and 9–No Tribal Purpose), plaintiff's method is unacceptable.[13]

---

**13.** This is not to say that the theories supporting each disallowance code are without basis. Be-

In its post-trial brief, defendant asks the court to adopt the view that Mr. Gillis' accounting approach "lacks any intellectual objectivity." Def's Br. filed Apr. 15, 1992, at 8. While the need to restate the flaws in the coding mechanisms is unnecessary, the court has several observations to make as they relate to this concept of intellectual objectivity. Mr. Gillis' efforts in untangling over 90,000 accounting documents were praiseworthy. He was ably assisted by Paul Ambrosiano, C.P.A., and a staff of three coding assistants. Mr. Gillis' approach did not lack all intellectual objectivity. In fact, based on his years of experience in Indian accounting matters, Mr. Gillis has shed important light on complex issues. Rather, the court deems that any flaws in Mr. Gillis' alternative approach are rooted in plaintiff's serious misapprehensions about the respective obligations of plaintiff and defendant in litigating the accounting phase of this case, as well as a series of invalid assumptions made by plaintiff since the case was reactivated in late 1983.

First, plaintiff's position on the validity of the 1975 GSA Report has been that an adequate supplemental accounting must be represented by a bound volume or volumes that include all supporting documentation indexed, cross-referenced, catalogued, arranged, and recorded so that plaintiff would be able to turn to a specific page(s) and "readily ascertain" how the trust was carried out. Indeed, early on in the December 1991 portion of this trial, plaintiff took exception to the use by defendant's witness Mr. Richards of the term "accounting report" to include many volumes of documents and supporting narrative material, since, in plaintiff's view, an accounting report must be a volume. Plaintiff's refusal to entertain anything but the most rigid standard for the acceptance of an accounting report has led it to adopt intractable positions on related issues, such as its need to examine authorities and supporting documentation and its need to reconstruct a paper trail out of available documents that the court is convinced might have revealed which expenditures were designed to benefit the tribe and which were not.

A second subjective theme that has pervaded the accounting case is that the government accountants have engaged in a cover-up of sorts, a conspiracy in which those individuals directing and performing the accounting analysis on both IMPL and IIM accounts have endeavored to conceal from the tribe the true nature of the accounting. The first attempt to discredit the Government's accounting approach took form in counsel for plaintiff's cross-examination of Mr. Richards. Plaintiff argues that Mr. Richards demonstrates the lack of integrity in the Government's approach to characterizing disbursements. Mr. Richards declared that in developing the accounting system, he "contrived" a system that he believed would be responsive to the requirements of *Blackfeet*. He testified that he had always used the term "contrived" with that intended meaning.

Plaintiff focused on the word "contrived" and attempted to portray it as an admission of evil motive on the part of GSA's accountants. Plaintiff then proclaimed the accounting method deceptive to the degree that it warranted striking defendant's entire accounting. The court advances an alternative explanation. Plaintiff merely failed to consider that perhaps the word "contrived," as employed by Mr. Richards, was no more than poor word choice on the witness' part. Arguably, the word was not absolutely bereft of meaning for a thesaurus lists as synonyms for "contrived" other words, such as "fashioned," "designed," "devised," and "improvised." Roget's II: The New Thesaurus 200 (1st ed. 1980). In other words, after acknowledging his obligation to provide a supplemental accounting of the kind required by *Blackfeet*, Mr. Richards sought to design, or improvise, or "contrive" a system that would enable plaintiff to discern whether the trust had been faithfully carried out.

The theme of deception in preparing the 1975 GSA Report resurfaced more overtly

cause of the inconsistencies demonstrated at trial, the court cannot accept plaintiff's asser-

tions that whole categories of vouchers are unacceptable.

in the March 1992 trial session in what the court will refer to as plaintiff's "conspiracy theory." Following the December 1991 recess, plaintiff reexamined the Government's 1975 GSA Report and returned in March convinced of the existence of a cover-up on the allocation of expenses for "agency" costs, but able to adduce only wholly unconvincing evidence of such malfeasance.

The court finds that the Government's approach to preparing the 1975 GSA Report was rational in that it was based on a reasonable interpretation of what the Commission required in *Blackfeet* for such an accounting. The supplement to the 1975 GSA Report is consistent with *Blackfeet* as it represents a continual refining of the Government's accounting. The cost categories that were devised by the GSA accountants made the report more meaningful than it would have been absent these categories. The report was prepared in good faith. The fact that the Government readily admits that it could not categorize over $600,000.00 of expenditures, the disbursements assigned to the "Distributable Program Cost" category, despite the fact that they might be disallowed because of that failure, renders the 1975 GSA Report more credible. The 1975 GSA Report, taken together with all of the supporting documentation, much of which plaintiff virtually ignored in preparing its exceptions to the supplemental accounting, constitutes an adequate accounting.

### 5. Defendant's concessions

In its pretrial brief outlining its proposed findings of fact, as well as during the accounting trial, defendant conceded that the following disbursements from "IMPL Ft. Apache, Arizona Account" should be disallowed: Agency Costs—$109,141.55; Support Operations—$139,640.95;[14] Unidenti-

fied—$30,325.87; Utilities—$13,774.51; and Law and Order—$28,943.94.

The total concessions from this IMPL account are $321,826.82.

As to the "Interest on IMPL Account," defendant conceded the following: Agency—$291.72; Support Operations—$12,494.60;[15] Unidentified—$160.81; and Law and Order—$1,299.69.

The total concessions from this IMPL account are $14,246.82.

Adding the concessions from the two accounts together yields total concessions of $336,073.64. Defendant conceded this amount, plaintiff accepted the concession, and defendant is discharged from any further liability with respect to the underlying cost centers. Additionally, plaintiff has conceded that all disbursements from the "Per Capita Cost" center were proper. Those disbursements total $78,310.00. Defendant is discharged from any liability thereon. Mr. Gillis' analysis was sufficient to entitle plaintiff to recover under two categories: $135,164.03 for illegible vouchers and $292,524.57 for missing vouchers.

Plaintiff failed to address in its pretrial proposed findings of fact disbursements for Payments for Depredations; Other Mineral Resources Program; Tribal Delegations and Council Affairs; and Indian Off-Reservation Program. By not addressing those cost centers in specific findings, plaintiff has waived any claims that disbursements should be disallowable, and defendant is discharged from liability with respect thereto.

### 6. Defendant's other witnesses

Dr. Charles M. Cook testified for defendant. Dr. Cook was qualified as an expert in the field of Indian history. In performing his research for this phase of the trial, Dr. Cook testified, he became familiar with IMPL funds. Initially, he reviewed doc-

14. This category included expenditures for the following support operations: Blacksmith—$27,020.60; Carpenter's Shop—$33,226.89; Flour and Grist Mill—$3,545.31; Machine Shop—$199.21; Garage—$46,871.22; and Saw Mill—$28,777.72.

15. The individual conceded expenditures under this category included: Blacksmith—$197.53; Carpenter's Shop—$5,133.47; Flour and Grist Mill—$10.00; Garage—$7,074.20; and Saw Mill—$8.40. The total is less than the amount that defendant conceded at trial; the court utilizes the latter figure.

uments describing the economic conditions on the reservation and specific requests for funds arising out of those conditions. He also examined authorizations for funds and expenditures, as well as narrative records relating to expenditures.

Dr. Cook prepared a report in 1977 entitled *Report Supplementing Defendant's Exhibit C–1 Concerning Rationing, Health Care, Roads, Bridges and Irrigation on the San Carlos and Fort Apache Indian Reservations* (the "Cook Report"). In the course of preparing this report, he discovered and utilized documents related to IMPL cost centers including agriculture, roads and bridges, rationing, and health care. He included in his report a discussion of the Colyer Agreement. Defendant called Dr. Cook to shed some light on the types of expenses that were incurred on the reservation. His charge was to review documents in the areas of health care, roads and bridges, education, and agriculture and forestry.

Dr. Edward M. Angel was qualified by the court as an expert historian in American history. Dr. Angel also testified in the 1986 trial. *See White Mountain Apache Tribe*, 11 Cl.Ct. at 624. His expert report for the accounting trial is entitled *Soldier Cattle and Accounts, Selected Issues in the History of the White Mountain Apaches*. In that report Dr. Angel treated a number of the issues surrounding the history of the White Mountain Apache Tribe's grazing lands. Dr. Angel was charged with reviewing the background behind the livestock program and evaluating the propriety and benefit to the tribe of disbursements under this program and under plaintiff's claim for tribal funds expended for purchases of land. He contributed, as well, to the evaluation of plaintiff's post–1946 IIM disbursements claim.

### 7. The Colyer Agreement

 Underlying plaintiff's accounting claims is the postulate that the Government obligated itself to pay for the tribe's basic needs in exchange for the tribe's submitting to resettlement on the reservation. The historical origin of the dealings between the White Mountain Apache Tribe and Vincent Colyer define the nature and scope of any such obligation. What is referred to as the Colyer Agreement, in fact, is not a discrete writing, but emerges from the correspondence of government representatives leading to the establishment of the reservation and the tribe's resettlement on it.

In an effort to encourage settlement between the white man and Indian, Congress passed "An Act making Appropriation for the current and contingent Expenses of the Indian Department, and for fulfilling Treaty Stipulations with various Indian Tribes for the Year ending June thirtieth, eighteen hundred and seventy," giving as its purpose, in part:

> to enable the President to maintain the peace among and with the various tribes, bands, and parties of Indians, *and to promote civilization among said Indians,* bring them, where practicable, upon reservations, relieve their necessities, and encourage their efforts at self-support; ...

Act of April 10, 1869, ch. 16, § 4, 16 Stat. 13, 40 (1869) (emphasis added).

In a letter dated July [illeg.], 1871, from President Grant to the Hon. C. Delano, Secretary of the Interior, President Grant recommended that enlarged powers be conferred on Secretary Colyer, Secretary of the Board of Indian Peace Commissioners, for the purpose of enabling him to make agreements with the tribes of the New Mexico and Arizona Territories to locate the tribes on reservations and provide for them there.

In a letter dated July [illeg.], 1871, B.R. Cowen, Acting Secretary of the Department of the Interior, wrote to Secretary Colyer, authorizing him to "proceed to New Mexico and Arizona Territories, and there take such action as in your judgment may be deemed wisest and most proper for locating the nomadic tribes of those Territories upon suitable reservations: bringing them under the control of the proper officers of the Indian Department, and supplying them with necessary subsistence and

clothing and whatever else may be needed."

In a letter dated September 5, 1871, to Lt. Col. John Green, Commanding Officer of the First Calvary, Camp Apache, Secretary Colyer reported:

As the White Mountain region has been set apart by the War Department as an Indian reservation, and there are several bands of peaceably disposed Apaches, who have for many years lived in this country, who can not be removed without much suffering to themselves, risk of war and expense to the Government, I have concluded to select the White Mountain Reservation ... as one of the Indian reservations upon which the Apache Indians of Arizona may be collected, fed, clothed, and otherwise provided for and protected, agreeable to the power conferred upon me at the suggestion of the President to the Honorable Secretary of the Interior under date July 21, 1871, and supplementary orders July 31, 1871, copies of which are herewith enclosed.

Subsequently, in a letter dated November 7, 1871, Secretary Colyer wrote Interior Secretary Delano and informed him of his choice of the White Mountain Indian Reservation as one location for the Apaches of Arizona and New Mexico. This information was conveyed by Interior Secretary Delano to President Grant in a communication also dated November 7, 1871. On November 9, 1871, President Grant directed the Secretary of War to carry out the Secretary of Interior's recommendations. In a report dated November 15, 1871, the Commissioner of Indian Affairs wrote:

With a view to ascertain the condition of the Apache bands both in New Mexico and Arizona, and to provide for their future by establishing them in suitable homes, under proper regulations and restrictions, Hon. Vincent Colyer, secretary of the board of Indian commissioners, by directions from you, dated 21st July last, visited these Territories; and, after some time spent in communicating with some of the chief men of the Apaches, and in examining localities that might be desirable for Indian reservations, the following places were selected by him and reported to the Department, viz: Tularosa valley, in New Mexico, for the Mitabres and Coyotero Apaches of that Territory; Camp Apache, in the White Mountains, Arizona Territory, for Coyotero and Chileow Apaches; Camp Grant, Arizona, for Arivaypa and Pinal Apaches; and Camp Verde, in the same Territory for the Mohave Apaches. He also requests that temporary asylums be established at Camps McDowell, Beal Springs, and Date Creek, Arizona, where the Tontis, Hualapais and western band of Mohave Apaches may be protected and fed until such time as it shall be found practicable to remove them to one of the above-named reservations. Peaceably established on the reservations indicated, afforded the means of subsistence, and provided with aids for their instruction in agriculture and other industrial pursuits, it is believed that the citizens of New Mexico and Arizona will have but few occasions for complaint against these Indians hereafter. For more particular information regarding them, reference is made to Mr. Colyer's communications respecting his mission to New Mexico and Arizona, embraced in the report of the board of Indian commissioners herewith, marked A, and to the reports of Superintendents Pope and Bendell, and Agent Piper, numbered 32, 27, and 37.

The record reflects that Secretary Colyer explained to the chiefs of the White Mountain Apaches that Congress had appropriated money for their subsistence, so long as they remained at peace on the reservation. In the Report of the Secretary of the Interior to Congress, Secretary Colyer declared that were the Indians to go off the reservation, they were "liable to be killed." Secretary Colyer's impression of the policy was that it was the obligation of the Government to feed the Indians removed to the reservation "until they can raise enough for themselves." *Id.* This belief was entirely consistent with contemporary federal policy towards the Indians. Dr. Cook detailed this policy in his report:

In 1868, the Commissioner of Indian Affairs made clear the goals to be pursued with the still wild tribes of the West. Speaking specifically of the Indians of Arizona among others he declared that "the best policy" for these Indians was "to treat with them, recognizing their rights, relieve them from suffering, remunerate them for that of which they have been deprived, and provide for their concentration upon tracts of country guaranteed to them for their possession against any intrusion by whites, and then teach and assist them in whatever will tend to make them ultimately, and at no distant day, a self-sustaining, intelligent people." Later in the same report he declared that the goal of federal policy was to encourage the Indians "to adopt the habits and methods of civilized life." He continued: "to carry this benevolent and humane policy into practical effect, we have stipulated to settle them upon ample reserves of good land, adapted to pastoral and agricultural pursuits, to subsist them as long as requisite, to supply them with all necessary stock and implements, and teachers to instruct them in letters, in the arts of civilizations, and in our holy religion."

Plaintiff argues that the obligation included providing food and clothing, as well as providing federal funds for health, education, and "all other requisites to 'promote civilization.'" Plf's Br. filed Feb. 18, 1992, at 7. Plaintiff argues that Dr. Cook's report on rationing and health care bars defendant from maintaining that any obligations created by the Colyer Agreement extended no further than the provision of food and clothing. Dr. Cook wrote that "the Congressional intent behind Colyer's mission went beyond a desire to locate the Apaches on a reserve and feed them. Rationing was merely an expedient. More importantly and ultimately, they were to be civilized."

Any analysis of the alleged "Colyer Obligation" should proceed under a "fair and honorable dealings" viewpoint. Both plaintiff and defendant advocate this view. The Court of Claims set forth in *Aleut Community v. United States*, 202 Ct.Cl. 182, 480 F.2d 831 (1973), the standard for determining the existence of a "special relationship" that may ultimately give rise to a fair and honorable dealings claim. *Aleut Community* relied on a series of Indian cases [16] to establish a four-part test for ascertaining the existence of a special relationship or obligation toward the Indians. The propriety of a fair and honorable dealings analysis has been reaffirmed recently by the United States Court of Appeals for the Federal Circuit in *Confederated Tribe of the Colville Reservation, Colville, Lake, Sanpoil–Nespelem, Okanogan, Methow, Columbia, Wenatchee, Chelan, Entiat, Palus, Joseph's Band of Nez Perce Indians v. United States*, 964 F.2d 1102 (Fed. Cir.1992).

The elements comprising such an analysis are that (1) the Government assumed some obligation; (2) the obligation was to a tribe, thereby triggering a "special relationship"; (3) the Government breached its obligation; and (4) the tribe suffered damage as a result of the breach. *Aleut Community*, 202 Ct.Cl. at 198, 480 F.2d at 839.

Other courts have treated the fair and honorable dealings analysis. Employing the Court of Claims' test from *Aleut Community*, the United States Court of Appeals for the Tenth Circuit wrote: "We agree that we should consider the background of statutes, treaties and any representations made to the Cherokee Nation to determine whether the requisite showing is made of a 'special relationship' as an element of the fair and honorable dealings claim." *Cherokee Nation of Oklahoma v. United States*, 937 F.2d 1539, at 1543 (10th Cir.1991).

For the purposes of the accounting phase of this litigation, the court need examine only elements 1 and 2—the existence of an obligation triggering a special relationship between plaintiff tribe and the Govern-

---

**16.** *Gila River Pima–Maricopa Indian Community v. United States*, 231 Ct.Cl. 193, 684 F.2d 852 (1982); *Lipan Apache Tribe v. United States*, 180 Ct.Cl. 487 (1967); *Oneida Tribe of Indians v. United States*, 165 Ct.Cl. 487, *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964).

ment. Once the scope of such a relationship is defined, should it exist, then allowances or disallowances of disbursements shall be made pursuant to the resolution of the scope of the agreement. It should be noted that the "special relationship" is not the same relationship of trustee/ward that defines the management and supervision of Indian resources or tribal accounts in general. Rather, the relationship must arise out of an agreement to provide certain special services to the members of the tribe at the Government's expense.

Defendant has taken the position that the Colyer Agreement imposes no obligation on the part of the Government to provide for the tribe. Defendant argues, alternatively, that any obligation extends only to feeding and clothing the tribe. Defendant also challenges plaintiff's assertion that the duration of any Colyer Obligation extended beyond 1925 through 1946. If there were such an obligation, defendant argues that it terminated in 1925 when Congress ceased appropriating money for plaintiff's support and civilization.

Defendant's sole argument in support of the nonexistence of a governmental obligation rests on the theory that any such obligation must be embodied in an "authorizing document." *Gila River Pima–Maricopa Indian Community v. United States*, 190 Ct.Cl. 790, 797–98, 427 F.2d 1194, 1199, *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Defendant argues that since the Colyer Agreement is not embodied in a treaty, statute, or executive order, it "cannot serve as the requisite anchor for any trust obligation to utilize public funds to provide any of the services which plaintiff asserts should have been provided." Def's Br. filed Apr. 15, 1992, at 4–5.

Defendant's assessment of the Government's obligation is unsound. An unbroken chain of documents gave rise to the Colyer Agreement, beginning with the letters tasking Vincent Colyer to enter into an understanding with plaintiff tribe in order to locate it onto a reservation. Secretary Colyer's decision to locate the Apaches of Western Arizona onto the White Mountain Apache Reservation, and the concurrence of the President and the Department of the Interior, gave rise to the relocation of the tribe to the reservation. An executive order was issued on November 9, 1871, approving the move. It would be unjust to permit the Government to consider the dealings between Secretary Colyer and plaintiff tribe as if they never occurred and the agreement itself as if it were nothing more than a hortatory concept, relieving the Government of even a modicum of responsibility. *See United States v. Oneida Nation of New York*, 217 Ct.Cl. 45, 576 F.2d 870 (1978) (Government required to accept more than a minimal level of responsibility for tribe when special relationship existed.)

Defendant's advocacy of the "fair and honorable dealings" analysis juxtaposed to defendant's attempt to anchor the Colyer Obligation in a specific written document is puzzling. Assuming, *arguendo*, that no relationship exists by virtue of a treaty, agreement, or executive order, the absence of such an explicit directive is not dispositive of the Colyer Obligation's viability. Defendant seems to confuse the variety of purposes of section 2 of the ICCA. Section 2 states that the "Commission shall hear and determine" the following claims:

(1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; ... and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.

The obvious differences between clauses 1 and 5 of section 2 indicate that the lack of an "authorizing document" was not "intended to be dispositive of a fair and honorable dealings claim." *Confederated Tribes of the Colville Reservation*, 964 F.2d 1102 at 1113; *see also Menominee Tribe of Indians v. United States*, 221 Ct.Cl. 506, 515, 607 F.2d 1335, 1341 (1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); *Seminole Nation v. United States*, 203 Ct.Cl. 637, 643, 492 F.2d 811, 821 n. 11 (1974); *Minnesota Chippewa Tribe v. United States*, 11 Cl.Ct. 221, 240 n. 9 (1986)

(order granting and denying motions for summary judgment).

After considering all of the evidence, the court agrees with plaintiff that a special relationship existed between plaintiff and the Government by virtue of the Colyer Agreement. The court finds, as well, that the Colyer Obligation extended beyond providing mere food and clothing. Secretary Colyer's objective was to carry out the intent of Congress that the Apaches of Arizona and New Mexico be relocated to the reservation, where they would be fed and clothed, protected, and eventually civilized.

Defendant argues against a broader reading of the Colyer Obligation, advancing the canon of statutory instruction that Indian treaties and agreements must be interpreted in a manner consistent with the Indians' contemporaneous understanding of such agreements—that the Indians merely understood that they would be fed and clothed. *See Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–31, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). The evidence of record justifies attributing to the Indians the understanding that once removed to the reservation, they would be unable to pursue their livelihood and were therefore entitled to learn new skills in an effort to assimilate themselves into the white man's society. Ample evidence is present that the Government encouraged the Indians' efforts at self-support and education, largely for the purpose of civilizing them for the convenience of whites who sought to continue westward expansion unmolested. This evidence cannot be ignored. *See Confederated Tribes of the Colville Reservation,* 964 F.2d at 1120–1121 (Nies, J., concurring) (analysis of entire course of dealings between tribe and Government may give rise to governmental obligation); *Snake or Piute Indians v. United States,* 125 Ct.Cl. 241, 245, 112 F.Supp. 543, 552 (1953) (finding that analysis of fair and honorable dealings is determined by all relevant evidence bearing on entire course of

dealings between parties; that motivations behind actions are germane to fair and honorable dealings analysis). Nor can the court ignore the meaning of the words "protected" and "otherwise cared for." Dr. Cook admitted under cross-examination that the words "otherwise cared for" might refer to health care.

Under a fair and honorable dealings analysis, the court finds that the agreement between the Government and plaintiff gives rise to the obligation to provide food, clothing, housing, health care, and education to plaintiff tribe. This scope of the Colyer Obligation is entirely consistent with the writings of Secretary Colyer, the understanding of the Indians at the time, and the actual intent of Congress in removing the Indians to the reservation.

As to the duration of the obligation, defendant contends that it terminated in 1925 when Congress ceased to appropriate money for the support of the Indians of Western Arizona and New Mexico. Plaintiff, as has previously been noted, declares the obligation to extend beyond that date through 1946. Defendant's position is supported by a preponderance of the evidence. First, the legislative history of appropriations for the Indians of Western Arizona and New Mexico reveals that appropriations aptly designated "Support" ceased in 1925. Thereafter, although Congress continued to appropriate money for the Indians of Western Arizona and New Mexico, the funds were for purposes other than basic support. Defendant took the position early on in the accounting trial that funds appropriated after 1925 were gratuities. Moreover, Mr. Gillis stated in his written report that Congress appropriated money for the Colyer Obligation up until 1925. After inviting and considering additional briefing from plaintiff to justify its current position, no valid reason has been offered to allow plaintiff to depart from its expert's earlier statement.[17]

---

17. Additionally, plaintiff's own documents, which it uses in support of the point that tribal funds were being expended for administrative purposes, also make reference to several post-

1925 disbursements as "gratuity appropriations." *See* Testimony of Bureau of Indian Affairs Commissioner S.M. Dodd in the Hearings Before the Subcommittee of House Committee

The following expenditures are disallowable as obligations of the Government under the Colyer Agreement between 1898 and 1925: Subsistence ($18,843.37); Houses and Buildings ($3,906.49); Aid to Indigent Indians ($2,054.29); Health Care ($19,918.09); and Education ($157,783.42). The total of these disallowances as Colyer Obligation under the Colyer Agreement is $202,505.66.

8. Analysis of cost centers; disallowance of other IMPL expenditures

a. *Distributable Program Costs* ($603,105.47)

The GSA designated the "Distributable Program" cost center as the repository for any sums that could not be allocated properly among the many accounts, either because there was little or no information to designate a specific account or because several accounts were designated as chargeable with expenses and there was no indication of how each should be charged. In either case all sums under Distributable Program costs must be disallowed. This category is one of the GSA's design. Trial revealed that the GSA was able in many instances to allocate small sums of money among different cost centers. The Government's inability to allocate these funds represents an inability of the Government to show that they were expended properly and reasonably calculated to benefit the tribe. The court therefore disallows $603,105.47 under this category.

b. *Health Care*[18] ($106,008.03)

Dr. Cook testified that, in the early teens and twenties of this century, expenditures in the health care field related primarily to construction of health care facilities. A tubercular camp was constructed in 1913. Later in the same decade, a hospital was built. Another hospital was built in the following decade. A second type of expenditure in the health field was pay of medical personnel, including nurses and physicians, as well as matrons who worked on the reservation. Matrons, Dr. Cook explained, worked on the reservation for the purpose of encouraging good health care and sanitation practices among the Indians. Dr. Cook testified that, in his opinion, the expenditures in the health care field were generally beneficial to the tribe. With the large number of illnesses on the reservation, including whooping cough, measles, tuberculosis, and meningitis, among others, health care was required to be provided to many Indians. Excluding the expenditures already disallowed by the court under the Colyer Agreement, the expenditures of funds for health care post–1925 were proper and allowable, with the exception of the amount disbursed for health care at the Theodore Roosevelt School, a school for Navajo boys. Having surveyed all the cost centers and the types and amounts of disbursements that are sustainable, as well as those that should be disallowed, the court is able to make a percentage disallowance that accurately approximates the amount expended for a non-tribal purpose. Based on a review of all the evidence on this subject, the court disallows 15 percent of the amount disbursed, or $12,913.49, for this portion of the Health Care cost center.

c. *Education*[19] ($413,296.31)

During this same period, much was happening on the reservation in the field of education. Dr. Cook testified to the existence of the day school and boarding school, the curriculum of which included principally vocational training programs. Dr. Cook testified that it was difficult to keep Indians in school. Nonetheless, in a report dated August 15, 1919, Superintendent Charles L. Davis wrote:

> The opposition to the schools which has existed in years past, due to the primitive condition of the Indians, is very

on Appropriations, 72d Cong., 2d Sess. 949 (1934).

18. Per the court's ruling on the Colyer Obligation, $19,918.09 of this amount has been disallowed.

19. Per the court's ruling on the Colyer Obligation, $157,783.42 of this amount has been disallowed.

fast disappearing. There was no general opposition during the last year and in fact there was much to indicate that the Indians are coming to accept the schools with more of the sense of approval than opposition. This change was quite manifest among the pupils also. The pupils are yet very reluctant to use the English language, but this reluctance is fast disappearing.

In Dr. Cook's opinion, the tribe benefitted from expenditures in this field. The witness testified that expenditures for education exclusively benefitted the tribe, with the exception of any funds used for the Navajo school on the reservation.

Apart from the pre–1925 expenditures for education which have been disallowed as a Colyer Obligation, as well as expenditures that were for the boarding school for Navajo boys, the remaining expenditures in this category were proper and allowable. Defendant was unable to identify the amount spent on the Navajo school. Plaintiff takes the position that the costs as a whole therefore must be disallowed. The court deems this result too draconian. After reviewing the evidence on this subject, the court finds that 30 percent of this category should be disallowed. The court accordingly disallows $76,653.87 stemming from the improper expenditures of tribal IMPL funds on the Navajo school for boys.

#### d. *Irrigation* ($88,776.51)

Dr. Cook testified that during Superintendent Davis' tenure at Fort Apache, Superintendent Davis was concerned about irrigation, particularly at Cibecue Creek, and looked for ways to improve it. In a letter to the Commissioner of Indian Affairs, dated July 10, 1925, Superintendent Davis stated that the chief problem for a number of years was to "get water enough for the little farms that the Indians have used for time immemorial, and to keep the intakes of their ditches open in such way as we could get out the little water that would come down the stream." Superintendent Davis saw the improvement of irrigation as a way ultimately to save money, which was frequently diverted into more expensive ag-

ricultural projects, largely because of a lack of irrigation.

Other superintendents agreed with this concept. In a letter dated February 18, 1928, from Superintendent William Donner to the Commissioner of Indian Affairs on the subject of the funds spent annually on irrigation, Superintendent Donner wrote:

I am quite sure that this amount can be cut in half by the improvement of our irrigation and power system. If we can save $5000 in the purchase of forage and the Indians can produce $5000 worth more produce for home consumption among themselves, and this is a very conservative estimate indeed, you can readily see that the system will almost pay for the improvement cost in one year.

The most important thing to consider aside from that set forth above is the fact that to encourage the Indians to farm along the White river, it will be necessary to provide better irrigating facilities....

Fencing to protect Indian farms also was a concern of the BIA, as was the development of a mill for the Indians. Dr. Cook testified that expenditures for improving farming and irrigation conditions on the reservation resulted in actual benefits to the tribe. Although plaintiff attempts to make the point that the purpose of the irrigation program was to erect a power generator, which plaintiff then classifies as an agency benefit and therefore disallowable, the evidence supports a finding that the Government did intend that this plant also be used to irrigate Indian land. Laborers were paid to dig and repair irrigation ditches, in some instances to permit fall plowing. The ancillary benefits that accrued to the tribe were in furtherance of distinct tribal programs and were indeed contemplated at the time the expenditure was made. Hence, they were proper.

#### e. *Grazing Program* ($29,141.91)

In Dr. Cook's opinion, the grazing program resulted in benefits to the tribe. The employee force paid with IMPL money was largely involved in stock work, in addition

**470**

to supervising the permittee grazing system. In a letter dated February 17, 1921, from the BIA Superintendent to Cato Sells, Commissioner of Indian Affairs, the superintendent reported:

> The Stock force is rather large but not in comparison to the activities and the profits coming from the live stock industry. Two men give all their time to the live stock of the Indians, about 15,000 head altogether. These herds are increasing very fast. One other stockman gives about half his time to stock and the other half to farming, etc.
>
> A fourth Stockman gives all his time to the tribal and schools herd, numbering about 2000 head. The grazing permittees count on from one to three men to the 1000 head, while we are doing quite as good work with about half the men on regular duty. These herds are returning a profit of three or four times the operating expenses, hence not large in comparison to the results obtained.

With regard to this program, Dr. Cook testified that the monetary return exceeded the expenses in maintaining it and that the tribe therefore realized a benefit through the program. The evidence supports a finding that these expenditures were reasonably calculated to benefit the tribe and are allowable.

#### f. *Agricultural Program* ($193,727.35)

Dr. Cook testified, as well, that he uncovered information related to the farming industry and the presence of agency farmers on the reservation. The August 8, 1921 narrative report on the Fort Apache Agency noted that "Indians are asking more and more for wire with which to carry out the [fencing] plan and the usual depredations to their crops are becoming fewer and fewer each year...." The agency farmers were reservation employees whose job it was to assist the Indians in learning good farming practices. Dr. Cook testified that under the superintendency of William Donner a sort of re-energizing of agriculture occurred on the reservation. Many crops were grown during the 1942–46 period for both sale and consumption by the Indians. According to Dr. Cook, the term "farming"

encompassed activities other than raising of livestock, specifically planting and harvesting. Fruit crops were grown by the agency and school farms. Many of the Indian farms were successfully fenced, preserving the crops from invasion of cattle and other foraging animals. Wheat was raised as a dry crop. In Dr. Cook's opinion, the tribe benefitted from agricultural activities on the reservation. Defendant has proved that the expenditures of these funds were reasonably calculated to benefit the tribe and should be allowed.

#### g. *Roads and Bridges* ($305,814.55)

Dr. Cook testified that concerns were manifested on the reservation regarding roads and bridges. Specifically, Dr. Cook mentioned access to and from the reservation. He noted that since there were a number of settlements at some distance from Whiteriver, it was difficult to reach them without better roads. Access to different settlements was important, not only for the purpose of buying and selling produce, but also for providing health services to the Indians. Superintendent Donner wrote to the Commissioner of Indian Affairs on July 22, 1930, and discussed the expenditure of funds for road construction:

> During the past few weeks we have had a number of cloud bursts which have torn our roads to pieces and made it almost impossible to get over the reservation by auto transportation. The Indian farming districts have been especially unfortunate and many of the farms and crops practically ruined by floods and the roads torn to pieces. Because of these unfortunate floods, it is going to be necessary to use most of our road fund for the replacement of bridges, culverts and repair of roads, which will leave very little for new construction. It is, therefore, respectfully requested that you give us consideration in apportioning the $250,000 provided in your Bill for roads on Indian reservations where the Federal Highway Act does not apply.
>
> The Federal Highway Act does not apply to the roads on this reservation maintained by the Agency, and never will, for

the reason that these roads have no outlet but to other roads to various sections of the reservation, making it possible for Indians to get out in wagons, and the administrative work be carried on with auto and wagon transportation.

....

All of our road work is carried on with Indian labor, and we not only need the roads, but the Indians need the work. We pay them $2.25 a day of eight hours and at this rate have Indians constantly begging for work. I think we should have at least $10,000 of the above amount appropriated for roads and bridge repairs. If you can not give us this amount give us what you can.

As this letter also indicates, road building served another purpose, in that frequently road building was used as a method to enable Indians to earn money. Indians were favored over non-Indians as laborers on these road projects, according to Dr. Cook. Dr. Cook pointed out that it was sometimes necessary to build roads in order to provide access to certain pastures and ranges. He added that roads on the reservations were used exclusively by the Indians. Dr. Cook's opinion was that the Indians benefitted by the building of roads and bridges on the reservation.

On cross-examination Dr. Cook conceded that opportunities for Indians to perform road work, particularly off the reservation, were limited. In addition, Mr. Gillis testified that a number of the roads running through the reservation had, in effect, become public highways. A letter dated November 19, 1915, to Commissioner of Indian Affairs Sells from Superintendent William Peterson stated:

We have on the Reservation, however, about eighty miles of road in general use by the traveling public. The part which is most used is the thirty miles from Fort Apache to the north line of the Reservation; next comes the twenty miles from Fort Apache to the Black River, and then the thirty miles from Cooley's Ranch to the Reservation line on the east, this being what is known as the Springerville Road, and forming a part of what is called the Ocean to Ocean Highway.

The road from Fort Apache top the north line of the Reservation is the most important, as it is the mail route and the one over which all freight comes in for the School and Agency and for the Army.

....

... There are, on the Reservation, upwards of two hundred and fifty miles of road used by the Indians and employees, as well as by the traveling public.... Of this distance, one hundred eighty miles is comparatively seldom traveled by people other than the Indians and Agency employees.

Later, in a letter dated August 23, 1919, the superintendent wrote Representative Carl Hayden and discussed the Springerville Road, declaring that "[i]t serves the sparse population west of Springerville, and when the road through is in fair condition a heavy intra state travel passes over it. The Indians use it almost none at all." The letter also stated that for the previous 5 years, all expenses for road work had been borne by the Fort Apache Indians.

Mr. Gillis sponsored important evidence to demonstrate that Congress attempted to coerce the Indians to pay for road work which they did not need. In a letter to the Commissioner of Indian Affairs, dated December 21, 1922, Superintendent Davis acknowledged receipt of a telegram regarding a proposed appropriation of $15,000.00 from tribal moneys to be used to construct a road "connecting Cooley with Springerville and other parts of Apache County." Superintendent Davis challenged the need for such a road, stating that from the Indians' perspective:

No Indians live now, never have lived, and probably never will live above Cooley, or any where on this proposed line. Neither will it serve government purpose as a freight road or other purposes, except very infrequently. It will serve the citizens of Apache County who desire to come to Cooley for commercial purposes, and will also serve a large number of cross-country tourists....

....

The view we must necessarily take is that it does not serve the Indians nor any government activity in their behalf. On the other hand the Indians and all government activities between here and Cooley demand heavy road improvements. The Indians must use that road very largely in marketing their products, going to Cooley to work or trade, and all supplies coming to the reservation for any and all purposes from outside points must come over the road from here to Cooley. When activity begins a[t] old Fort Apache preparatory to opening a school for Navajo pupils all supplies used there and all pupils brought to the school must use the same r[oa]d. It is the main rail route for the entire reservation, and in fact the one outlet from the reservation to the outside world.

We have been trying for years to get money whereby to make a good road from here to Cooley, but so far without avail. While this road is needed so very much we can not look with approval on the withdrawal of tribal moneys needed to build homes, open farms, make roads, etc., for the Indians and use it where it will do them no good.

The superintendent sent a similar letter to Representative Hayden, also dated December 21, 1922:

To begin by appropriating money for a road that will do the Indians no good, nor aid the government in their upbuilding, and charge the same to their account, when we can not get money to make roads they need, build houses for them, open farms, etc. means grabbing their funds for other purposes while withholding it for what they need. The road from here to Cooley is easily one hundred times more important to the Indians than the proposed road from Cooley to Springerville. I trust you will appreciate my position on this matter.

This letter brought the following reply from Representative Hayden:

I am in receipt of your letter of December 21st, and beg to say that I am greatly disappointed that my bill authorizing the appropriation of $15,000 to pay one-half of the cost of constructing a road from Cooley to the Northeast boundary of the Fort Apache Indian reservation does not meet with your approval. If the Apache Indians do not consider their reservation to be a part of the State of Arizona and that they are not a portion of the population of the State, then they would be fully justified in refusing to cooperate in its advancement. With that point of view they are at liberty to ignore the fact that the tax-payers of Apache County, of which their Reservation constitutes an untaxed part, have obligated themselves to pay $15,000 out of their own pockets for the construction of a road which is an improvement to the property belonging to the Indians. Apache County has less population and less taxable wealth than any other county in the State of Arizona but apparently the Apache Indians are utterly indifferent toward any effort that these white neighbors of theirs are making toward the development of Western Arizona.

I fully realize that from the Indian point of view the road between Cooley and Whiteriver is the most important highway on their Reservation. I sincerely regret that the County of Navajo did not include that highway in its road building program, but will it not be very persuasive to the tax-payers of Navajo County that they should incorporate the Cooley–Whiteriver Road in their next bond issue if they are advised that the Apache Indians have shown a spirit of cooperation with the adjoining County of Apache in the manner that I have proposed?

I am sure that the Indians of Fort Apache Indian Reservation, if they are properly advised, will not adopt such a narrow and selfish policy, but that upon reflection they will conclude that as the owners of a vast and very valuable estate within the State of Arizona, that it is in their own best interest to aid and assist in its up-building and advancement whenever they can do so without material injury to their own welfare.

There were other instances wherein tribal moneys were being appropriated to pay

for roads seldom used by the Indians. In a letter of April 2, 1928, to the Commissioner of Indian Affairs, Superintendent Donner wrote:

> I might also state that, as you know, legislation has recently been passed for the expenditure of $100,000 of tribal moneys to match a similar amount appropriated by the State for an improved highway between Whiteriver and the boundary line on the north end of the reservation, a distance of approximately 25 miles. Over this highway will travel at least five tourist cars and people who are not connected with the reservation to every car owned by an employee or an Indian within this reservation. In other words, the State and Navajo County will derive at least 80 percent of the total cost of the highway, while we are paying from tribal funds 50 percent of the cost of construction of this highway.

> I am sure the Senator [Ashurst] will understand my position in this matter. We want to be fair, but we do not care to be the sugar-tit for the entire County.

This category of expenditure was the most impressive portion of plaintiff's case. In light of all evidence presented at trial, the court finds that a majority of expenditures for roads and bridges out of IMPL funds was not intended to benefit the tribe. Any ancillary or indirect benefit to the tribe was not identified at the time of the expenditure. The court does not deem that incurring the goodwill of the taxpayers of Arizona is a substantial enough benefit to plaintiff to charge it with the expenses for road construction to benefit tourists and other individuals unconnected with the reservation. Indeed, it was not plaintiff's place to act as the source of financial nourishment for the road construction programs of Western Arizona. Accordingly, the court disallows 80 percent, or $244,651.64, of disbursements of tribal moneys spent on roads and bridges.

#### h. *Indian Forests (Timber) Program* ($132,822.70)

As to the forestry program, Dr. Cook testified that labor was provided to build roads into the forest for fire protection. Employees were hired as forest rangers, fire guards, and lookouts. Some of these individuals were Indians. Dr. Cook testified that earlier documents indicated that it was believed that timber sales would be vastly beneficial to the Indians. Trial on the resource mismanagement phase bore out this view. *See White Mountain Apache Tribe,* 11 Cl.Ct. at 666. Because the expenditures under this category were reasonably calculated to benefit plaintiff, they are allowable.[20]

#### i. *Tribal Livestock Program* ($547,533.42)

Dr. Angel established that there was concern on the reservation about the lack of tillable land. As a result, it was thought that livestock raising would be a good industry to enable the tribe to achieve self-sufficiency. The earlier opinion in the resource mismanagement phase discusses this program in detail. *See White Mountain Apache Tribe,* 11 Cl.Ct. at 647. Superintendent C.W. Crouse, for instance, recommended on several occasions that money from grazing permittees be applied to purchase of livestock. Evidence presented during the accounting trial revealed that in 1903 the Indian Office purchased 250 cows and heifers for issue to the tribe. By 1910 the tribe owned approximately 4,000 head of cattle.

Dr. Angel testified that other agency superintendents and BIA officials encouraged the livestock program. On September 27, 1911, Charles L. Davis, who was at that time acting as Supervisor of Livestock, published an inspection report and observed the following:

> The cattle industry is destined to be the paramount one for these Indians and

---

**20.** At trial the court discovered an admission on the part of the Government that approximately $4 million, collected from Indian timber sales, had been disbursed for purposes which were non-Indian related, instead of for housing. The court has no basis for making an award of the $4 million, because plaintiff presented no evidence (and the court on its own uncovered none) concerning how this $4 million related to other monies currently in issue.

every thing should be so shaped as fast as possible. They are now showing a very commendable interest in their cattle, and most families are exercising a close supervisions [sic] over their herds and their numbers are increasing. Even in districts where there has been virtually no supervision, and where the Indians have been left largely to their devices as to care and management we find the herds on the increase and the Indians quite well informed as to how they should be cared for. In this I am greatly encouraged that cattle growing can be made a success among these Indians.

Indian Inspector Otis Goodall was also supportive of the grazing program. He cautioned in his July 14, 1912 letter to the Commissioner of Indian Affairs that a stock man be selected "who has integr[i]ty enough to spend Indian moneys wisely and judiciously." The Report of the Commissioner of Indian Affairs to the Secretary of the Interior for the Fiscal Year Ended June 30, 1914, recounted that the tribe had eventually purchased mostly Hereford cattle and bulls for upgrading stock.

Dr. Angel testified that the tribal herd itself was created in 1917 to raise revenue for the tribe and to develop a way by which well-bred cattle could be distributed to individual Indians. Five hundred heifers and 120 bulls were bought from Texas ranchers at a cost of $36,000.00. Thereafter, IMPL funds were used at least on one occasion to purchase 50 bulls. These bulls were to be added to tribal herd, while cattle was to be distributed to individual families on an as-needed basis. Superintendent Davis discussed upgrading stock with the Tribal Council. A report by BIA Inspector E.M. Sween indicated that the Tribal Council acted quickly on Superintendent Davis' suggestion to invest $20,000.00 for the purchase of high-grade stock. Superintendent Davis informed the Council members that they could wait, but they declined and gave their approval. William Alchesay, longtime leader of the White Mountain Apache Tribe, also agreed that the livestock industry should be the tribe's primary industry. In a letter dated February 15, 1923, to Commissioner of Indian Affairs Charles H. Burke, Mr. Alchesay stated:

Next after the building of houses and the improvement of reservation roads our moneys should be devoted to the improvement of our livestock, particularly the cattle on which we must depend primarily for a living. With this should go the building of fences, corrals, and holding pastures to give a better system of handling cattle and marketing the surplus. We realize that we and our children must depend primarily on cattle for the support of our families, and to pay for houses and other things to improve and elevate our home life.

Dr. Angel identified other benefits that derived from the livestock industry, including selling livestock to the school and agency and giving steers to indigent Indians. The livestock program was used to educate Indians on how to better care for livestock.

The "Old Folks Herd" was established in the late 1930's by tribal resolution. Congress then appropriated $40,000.00 for the program. The goal of the program was to distribute a greater number of cattle to Indian families, more than the 5 or 10 per family that had been provided through the tribal herd. With the Old Folks Herd established, approximately 20 cattle per family could be distributed. In addition, the herd was instituted to provide relief to older Apaches. Dr. Angel testified that eventually Superintendent Donner combined this herd, as well as the original tribal herd, and a third herd, known as the "registered herd," into one large herd.

The largest expense category under this cost center is "Pay of Stockmen and Supervisor of Livestock." Dr. Cook testified about the role of agency employees known as "stockmen." These stockmen had a variety of roles, including rounding up cattle and settling disputes between Indian and non-Indian permittees. Dr. Angel's report indicates that the livestock supervisor worked with Indians, training them in the areas of branding, pasturing, and salting cattle. The other expense categories challenged by plaintiff are "Feed and Care of Livestock," which included purchases such

as rock stock salt, and "Pay of Laborers," who were required to build breeding pastures for cattle and corrals for the handling of livestock.

In view of the extensive history documented by Dr. Angel, plaintiff's contention that there was not a tribal herd is rejected. The purchase of livestock and the payment of laborers, as well as the feed and care of livestock, were all reasonably calculated to benefit the tribe. The expenditures under this category were proper.

### j. *Purchase of Land* ($7,392.76)

Plaintiff's principal complaint about funds attributed to this cost center is that the lands purchased were already owned by plaintiff. The record does not support plaintiff's position. In his report prepared for the accounting phase of litigation, Dr. Angel treated a number of the issues surrounding the history of the Fort Apache Indian Reservation grazing lands. In a portion of his testimony, Dr. Angel discussed plaintiff's claim that the Government purchased land from the Aztec Land and Cattle Company ("Aztec"), using IMPL funds, despite the fact that title in those lands was already vested in the tribe. Dr. Angel disagreed with plaintiff's claim. The witness cited to another history of the reservation, *Mixed–Bloods, Apaches, and Cattle Barons: Documents for a History of the Livestock Economy on the White Mountain Reservation, Arizona,* by Thomas R. McGuire, which discussed, in part, a tract of land on the northern border of Fort Apache. This land had been granted originally to the Atlantic & Pacific Railroad. Subsequently, the railroad experienced financial difficulties and closed down. Aztec, formed by creditors of the railroad, took over land located in township 10 north, ranges 18 and 19 east, which was north of the reservation and south of Holbrook, Arizona. Sometime thereafter, Superintendent Crouse inquired as to the identity of the landowner. Because he thought that the land was Indian-owned, he contacted the Commissioner of General Land Office in order to investigate the matter and was informed that Aztec held title to the land. Later the Fort Apache Indians expressed interest in ownership of that land. In 1928 the Interior Department proposed to Congress that the land be purchased with IMPL funds. Since the land was perceived to be valuable for timber and grazing, Congress passed a bill on May 29, 1928, allowing purchase of land, amounting to approximately 3,000 acres at a price of $2.00 per acre. Act of May 29, 1928, ch. 873, 45 Stat. 962 (1928).

In 1931 Aztec agreed to sell more land to the tribe—this time 630 acres at a cost of $2.00 per acre. Again, Congress responded by authorizing the expenditure of IMPL funds for the purchase of 629 acres. Act of March 4, 1931, ch. 493, 46 Stat. 1517 (1931). This land was purchased and added to the reservation.

The evidence presented at trial is sufficient to support a finding that the expenditure of funds for the purchase of land was intended to benefit plaintiff. For these reasons, the disbursements under the category "Purchase of Land" were proper and will be allowed.

### k. *Issues and Advances to Indians— Reimbursable* ($278,710.36)

The BIA authorized in regulations issued during 1911 the practice of making reimbursable public monies available to able-bodied Indians. In 1913 the BIA issued a ruling indicating that IMPL funds could be used for the same purpose. The Tribal Council asked that money be used in this manner for the purchase of bulls. The BIA sought to disburse $50,000.00 of these funds on a reimbursable basis in order to build Indian homes and provide livestock and farm equipment. The evidence fully supports a finding that these expenses were reasonably calculated to benefit the tribe and therefore are proper.

### 9. Summary of disallowable expenditures for IMPL funds

Plaintiff takes $336,073.64 in concessions by defendant. Plaintiff is entitled to $135,164.03 for illegible vouchers and $292,524.57 for missing vouchers from IMPL

accounts. Plaintiff receives $202,505.66 as Colyer Obligation moneys for subsistence, health, and education. Plaintiff takes, as well, $603,105.47 under Distributable Program Costs. Plaintiff shall receive $12,913.49 under Health Care in connection with the Navajo Boys' School. Plaintiff receives $76,653.87 under Education for the post–1925 expenditures on the Theodore Roosevelt School for Navajo boys. Plaintiff shall receive $244,651.64 for Roads and Bridges. Plaintiff's total award on its IMPL claim is $1,903,588.37.

II. *Disbursements from tribal IIM accounts* ($11,381,063.43)

Ms. Erbacher and another defense witness, former BIA Superintendent John O. Crow, testified that any IIM disbursements required a relatively formal budgetmaking process. Mr. Crow's testimony was particularly compelling since he was the only percipient witness. Mr. Crow was an employee of the BIA from 1934 until 1973. He served in numerous capacities while employed by the BIA, including holding the position of acting superintendent at the Colorado River reservation and superintendent at Fort Apache in the early 1950's for approximately 5 years. As superintendent, he had frequent contact with members of the Tribal Council.

These witnesses established that the Tribal Council, assisted by the superintendent, determined what tribal IIM disbursements would be made for the upcoming fiscal year. Next, the Tribal Council adopted a budget resolution authorizing these expenditures. Besides the annual budget resolution, the Tribal Council adopted resolutions authorizing specific disbursements during the year. The approval of the Commissioner of Indian Affairs was required for any of these disbursements, with the exception of the first $1,000.00 of incidental expenditures, even when the superintendent approved the disbursement.

Ms. Erbacher testified that the procedures governing the disbursement of funds from the tribal IIM accounts was similar to the procedures for IMPL funds in that all items purchased had to be weighed, count-ed, and otherwise certified as to their quality and quantity. When services were provided to the tribe, an agent had to certify that all such services had been rendered. Payments were required to be supported by vouchers.

The White Mountain Apache Tribe Account No. W–91 (the "Disbursing Account") was the primary disbursing account for the funds transferred from the "Income Account," No. W–90.

Plaintiff has excepted to all disbursements made from the IIM accounts.

1. IIM funds

At the outset of her testimony on IIM disbursements, Ms. Erbacher detailed the various IIM funds at issue. The "White Mountain Apache Tribe Court Fund," established in 1936, was used to support the police, pay witness fees, and finance operation of the court itself. Between 1936 and 1946, the fund had disbursed $35,025.23.

In May 1939 the Tribal Council established the "Fishing Permits Fund." The Tribal Council authorized the superintendent to sell fishing permits and deposit money into this fund. Between 1939 and 1946, a total of $1,846.75 was disbursed from this fund.

The "Fort Apache Rehabilitation Trust Fund 1938" was an active account for a short period of time, from July 1939 through October 1940. Federal rehabilitation funds were placed into this fund for the purpose of building a community center. The amount collected, $26,208.90, was disbursed for this purpose.

The "Receipt Fund" was established in 1939. This fund collected money from the sale of timber, grazing permits, and mineral royalties. By 1946 the Receipt Fund had disbursed $832,449.22.

The "Disbursing Fund" was an account established for the purpose of providing money for programs approved by the Tribal Council. Funds spent from this account included funds for recreation and relief, as well as repair of equipment owned by the tribe. The monies collected by this fund

were transferred primarily from the Receipt Fund.

The "Old Folks Herd Fund" was established in 1942 to support tribal livestock operations at Fort Apache. By 1946 $168,629.61 was collected into the fund and $106,091.00 disbursed. Disbursements were made, in part, to provide support for the elderly and indigent members of the tribe. The Tribal Council recognized the benefit of this fund, which provided monetary payments to the tribe from the sale of cattle.

The "Unidentified Brands Fund," established in December 1942, was a fund designed to hold proceeds from the sale of cattle and other livestock, for which the ownership had not been determined. When the owner of the livestock sold had been formally identified, money from this fund was disbursed. Between 1942 and 1946, $8,687.05 had been disbursed to the owners of the cattle sold, once the identity of the owners had been established.

The "Wild Horse Project" was established in mid–1943. The purpose of the Project was to curb the number of wild horses on the reservation, thereby improving range conditions. Bounties were paid from this fund for these horses, which were converted into food for fish.

### 2. IIM disbursements

The first dispute for resolution with respect to the IIM disbursements is the actual amount that properly is within the bounds of plaintiff's IIM claim. Defendant has taken the position that the "Fort Apache Stock Association (Beef Sales) Account," although monitored under the IIM system, is not a tribal account, but, instead, a series of accounts of individual Indians. Plaintiff argues that this account properly is denominated tribal. Defendant also maintains that the court should deduct from the total IIM funds at issue the amount transferred from the Receipt Fund to the Disbursing Fund, since this money was already part of the funds challenged in

the Disbursing Fund. Defendant provided a figure of $3.5 million at trial representing the portion of the total $3,925,520.10 disbursed from the Receipt Fund that would constitute money transferred to the Disbursing Fund. In post-trial briefing, defendant attempted to clarify the figure, stating that the exact amount that would constitute double counting is $3,548,074.13. The court first addresses the Disbursing/Receipt Fund controversy.

The issue of double counting for the Receipt and Disbursing Funds crystallized following the close of trial in the instant case. Defendant filed a motion to amend its proposed findings in which it attempted to set out the exact amount that was transferred from the Receipt Fund to the Disbursing Fund during the period from 1897 to 1955. This is the amount that defendant contends would constitute double counting. Plaintiff has vigorously objected. Plaintiff contends that permitting defendant to amend its proposed findings would be tantamount to reopening the case and that no evidence was presented at trial to demonstrate that an amount should be deducted from the IIM claim. It is concluded that the trial record supplies the answer to this conundrum.

Initially, Ms. Erbacher testified that money was transferred from the Receipt Fund to the Disbursing Fund. She testified that the Disbursing Fund consisted largely of transfers from the Receipt Fund. She showed examples of these transfers by presenting ledger cards from the Receipt Fund account that traced the transfers into the Disbursing Fund. As to the exact amount, on the last day of trial, Ms. Erbacher presented the court with a figure of $4,682,106.48, which, according to the witness, represented the total amount that should be deducted from IIM funds at issue in the case. Of that sum Ms. Erbacher testified that $1,682,108.48 represented a deduction for the stock association.[21] The remaining $3.5 million represented the additional deduction from IIM funds at issue,

21. As previously noted, defendant maintains that this fund was an individual, not a tribal, IIM fund.

obviously from the one other source of potential double counting, the Receipt Fund. This evidence was understood clearly by the court at trial. Moreover, defendant's exhibits DX GSA–IIM–1, pp. 84–109, and DX GSA IIM–59, pp. 59–127, which consist of copies of ledger cards, demonstrate that more than $3.5 million was transferred to the Disbursing Fund from the Receipt Fund, not merely disbursed. The court therefore deducts $3.5 million from the total IIM funds at issue.[22]

The court now turns to the question of a deduction from the total IIM funds at issue based on defendant's contention that the Stock Association Fund was comprised of individual monies, rather than tribal monies, which are the focus of this trial.

In a letter dated February 8, 1928, to the Commissioner of Indian Affairs Superintendent Donner wrote:

> In connection with the organization of stock associations, it is necessary to have what is known as the association fund. For instance, if at this place we have what is called the Cibecue Live Stock Association and the East Fork Live Stock Association, then each association must have their individual account with our office.
>
> To illustrate what I want to do, I will say that in 1921 we organized at Fort Hall what we called the Fort Hall Stock Association and had an account known as the Fort Hall Stock Association. To the credit of this account was deposited all monies received from the sale of stock of all the members belonging to the association. Out of this fund, we also paid the range fees, the purchase of bulls, the purchase of stock, salt, round-up supplies and the salaries of several range riders, the riders being selected by the stock association. This was made possible by collecting a certain assessment on each head of stock owned by each member of the Association. For instance, a member

owned 500 head of cattle and the charge for range and incidentals, as mentioned above was $1.50 per head. And if at the sale he sold 40 or 50 head of beef cattle, $750 would be taken out of the proceeds of the sale and left in the Stock Association fund for the above-mentioned expenses. As we arranged there and as still being carried on, everyone owning cattle, regardless of whether it was one head or 100 head, paid a certain assessment per head for expenses.

Defendant takes the position that this letter helps to establish that the stock associations were wholly-owned by individuals living on the reservation and that they were not a tribal enterprise. Ms. Erbacher testified that she believed that the Fort Apache Stock Association was, in effect, an umbrella organization—an association of associations, comprised of the various stock associations from the different areas of the reservation. As a result, defendant argues, the stock association should not have been included in the tribal enterprise group.[23] Any monies spent from these funds were monies of individuals and not tribal funds. Excluding this money from the tribal enterprise group would effectively reduce the funds that are included in plaintiff's IIM claim.

A letter dated February 28, 1928, to Superintendent Donner from the Commissioner of Indian Affairs stated:

> Receipt is acknowledged of your letter date January 31 relative to the methods of handling the individually owned livestock of the Fort Apache Indians and accounting for the funds derived from the industry. We agree with you that the organization of stock associations among the Indians will no doubt result in their taking a more active interest in the livestock industry and as the plans outlined appear to be practicable, you may proceed to put them into effect.

---

**22.** In an affidavit submitted with its post-trial motion, defendant offers a figure of $3,548,-074.13 to represent the moneys transferred from the Receipt Fund to the Disbursing Fund. This money exceeds the figure provided to the court at time of trial. Because this evidence comes

too late, the court will not deduct the additional $48,074.13 from the IIM funds at issue.

**23.** Defendant's witness Ms. Erbacher used the term "tribal enterprise group" interchangeably with "tribal IIM funds."

With regard to handling the funds, it is believed that the following method should be followed. First, organize the different associations giving a definite name to each organization and providing for the usual officers in each case. Second, carry the funds of each association exactly as you carry individual Indian monies voluntarily deposited treating the association as an individual. Third, expend such funds as are properly chargeable against the association by drawing an individual Indian money check against the account of the association. Fourth, dispose of the net proceeds for funds remaining after expenses are met by transferring such amounts as may be prorated to the individual Indian from the association account to the individual account and whether paying it direct in case of competent Indians or carrying it on the individual account for the expenditure under supervision.

Other letters were introduced which demonstrated the same point. The letters, however, make no mention of a Fort Apache Stock Association. These letters were admitted for the purpose of demonstrating how stock association accounts were handled as early as 1928.

On cross-examination plaintiff attempted to establish that the stock associations were included in summary sheets in the 1975 IMPL Report, and by implication, that the GSA included them as tribal monies. Ms. Erbacher testified that the monies were listed merely as IIM funds, without a statement as to whether they were for individual or tribal purposes. As early as 1985, defendant took the position that these were not tribal monies, but individual ones. *See White Mountain Apache Tribe v. United States*, 9 Cl.Ct. 1, 5 (1985) (order granting and denying motion for supplemental accounting).

Defendant introduced through Ms. Erbacher an IIM ledger sheet for the Fort Apache Stock Association, account No. A–1B. On that sheet, marked "Sheet 1," is an entry for official receipt No. 416205. The receipt covered funds for a slaughter permit in the amount of $4.00. Both the receipt and balance are $4.00. Ms. Erbacher testified that this sheet represented the first ledger card for this association. Defendant also introduced a voucher for purchases from the Fort Apache Stock Association. The cost breakdown allocates 6 funds as the purchasers of the items in the voucher. A second voucher naming Fort Apache Stock Association uses as authority section 18 of the Individual Indian Money Regulations (Dec. 13, 1937). Section 18 governed disbursements of individual, and not tribal, IIM funds and did not require a resolution, unlike disbursements from tribal funds. Ms. Erbacher testified that she believed that the citation to the IIM regulations indicated that the Fort Apache Stock Association was to be treated as an IIM account, not a tribal IIM account. The third document is a payroll voucher for purchases from Fort Apache Stock Association where the allocation includes mentions of Canyon Day, Carizo, Cibecue, and Upper Cedar Creek—all local stock associations.

Ms. Erbacher testified that she reviewed 50 percent of all the vouchers of the Fort Apache Stock Association. She testified that the vouchers presented were representative of the vouchers in the stock associations.

The testimony and documentary evidence are consistent with defendant's position on the Fort Apache Stock Association and support a finding that the Fort Apache Stock Association funds were individual and not tribal moneys. Therefore, the court deducts $1,682,106.48 as reflective of the stock association moneys from the total IIM disbursements to which plaintiff excepts.

Adding this figure of $1,682,106.48 to the amount deducted for double counting from the Receipt/Disbursing Fund, $3,500,-000.00, yields a total deduction of $5,182,-106.48 from the IIM funds at issue. Consequently, the total amount of IIM funds remaining properly at issue in this case is $6,198,956.95, resulting from the deduction of $5,182,106.48 from the original amount claimed, $11,381,063.43.

In addition to the disputes related to the Fort Apache Stock Association and the Re-

ceipt and Disbursing Funds, another area of controversy at trial centered on the issue of whether plaintiff had forfeited the opportunity to receive a supplemental accounting from defendant. At the commencement of the portion of the trial related to IIM disbursements, plaintiff raised the issue that defendant had failed to provide an IIM accounting.

The background of plaintiff's claim that it is entitled to a supplemental accounting, begins with an order of March 20, 1974, issued by the Commission, mandating that the Government render an accounting for IIM funds.[24] On February 13, 1984, this court issued an order requiring plaintiff to list all the specific supplemental accountings that plaintiff requested GSA to perform. Plaintiff filed a motion on March 1, 1984, the introduction of which essentially restated the language of the February 13 order. Next, plaintiff enumerated its requests for supplemental accountings. A request for a supplemental accounting for IIM disbursements was not included among them. *White Mountain Apache Tribe*, 9 Cl.Ct. at 2–11. Defendant's opposition to plaintiff's motion for a supplemental accounting, filed June 1, 1984, restated plaintiff's IIM demands. Those demands included only production of IIM disbursement vouchers for tribal IIM accounts, Livestock Association IIM accounts, and other tribal co-op or enterprise accounts that plaintiff's subsequent inquiry caused to be discovered. *Id.* at 4. Plaintiff received copies of IIM authorities in February 1988, and between that time and the date of the court's order of May 1, 1990, limiting the scope of claims in this trial, *White Mountain Apache Tribe v. United States*, 20 Cl.Ct. 371 (1990) (order granting motion to dismiss and granting and denying motion in *limine*), plaintiff did not bring to the court's attention that it had not received the supplemental accounting to which it believed itself entitled.

24. The order mandated, as well, an accounting for IMPL accounts and property other than money.

Defendant took the position at trial that its IIM accounting constitutes an adequate accounting under the approach adopted by *Minnesota Chippewa.* The court declines to endorse this view. Rather, the inquiry is whether the supplemental material provided by defendant could take the place of a GSA report. It is the court's view that plaintiff has forfeited the opportunity to request a supplemental accounting of IIM disbursements because of plaintiff's failure to bring the matter to the court's attention when plaintiff was given multiple opportunities to clarify the nature of the supplemental accountings that it requested. The record supports a finding that plaintiff forfeited its right to a supplemental accounting when it failed to request one following the court's orders of almost 8 years ago that plaintiff expressly do so. Furthermore, during the last 5 years since the focus of litigation turned from management of resources to accounting, the court has conducted many status conferences with the parties. At no time did plaintiff bring to the court's attention that it had not received a supplemental IIM accounting. Only at trial did plaintiff's complete dissatisfaction with the IIM documentation emerge. Even if plaintiff had received a supplemental IIM accounting, it is unlikely that plaintiff's response to it would have been any different than it was—plaintiff excepted to every disbursement, which is, of course, plaintiff's right. At the same time, the court is mindful that defendant is unable to produce more than $8 million of vouchers supporting IIM disbursements, mostly post–1949.

Dr. Angel was recalled to testify on the subject of post–1946 IIM disbursements. His report, entitled "Tribal Use of IIM Finds at the Fort Apache Reservation, 1946 to 1966," [25] examined specifically how the Tribal Council chose to spend its funds, how the Tribal Council attempted to accomplish certain goals in passing various budget resolutions, and how it cooperated with

25. Although Dr. Angel's report evaluated IIM disbursements during this time period, he was permitted only to testify with respect to the period up until 1955. The ensuing years were not within the scope of this litigation.

or was assisted by the BIA in its expenditure of IIM funds.

The historical documents examined by Dr. Angel disclosed that a 3–member committee from the Tribal Council worked with BIA officials in an attempt to fashion a budget. The Tribal Council itself would then vote on the budget. After the budget was approved, according to the Tribal Constitution, it was sent to the Secretary of the Interior for approval or disapproval.

Article VI, § 1, ¶ D of the Constitution and By–Laws of the White Mountain Apache Tribe of the Fort Apache Indian Reservation Arizona, Approved Aug. 28, 1938, discusses the Tribal Council's control over IIM expenditures and the Secretary of the Interior's approval of that process.

Defendant introduced a letter from G. Spaulding, Director of the Division of Program of the BIA, to the Chairman of the White Mountain Apache Tribal Council dated J[illeg.] 21, 1952. In that letter the director wrote:

> We are pleased that the tribal council has consistently, over the past years, planned the prudent expenditure of local tribal funds for the greatest benefit of the tribe, and has also planned wise investment of surplus tribal funds by purchasing Government Defense Bonds and other securities. We hope that the tribal council, in its farsightedness, is also working on an overall reservation program which will guide the use of tribal resources for the time when federal supervision over tribal affairs will be completely placed in the hands of the tribal reservation officials.

This letter is particularly germane in that it describes not only the government officials' retrospective view in 1952 of the Tribal Council's control of IIM funds, but addresses the federal view that at a certain point in time the tribe would manage entirely its own affairs. The evidence supports a finding that the tribe continued to increase its control over its affairs. This control was fostered during a movement known as the "Termination Movement" when Congress, particularly during the Eisenhower Administration, attempted to increase tribal direction and responsibility over its own resources.[26]

3. **Test for disallowance of IIM expenditures**

■ Defendant has argued in the alternative two different tests for determining the propriety of IIM disbursements. The first test is that an expenditure was "reasonably calculated to benefit the Tribe," the test used in *Te–Moak Bands*, 23 Cl.Ct. at 437, and utilized by this court in its analysis of the propriety of IMPL disbursements. The second test is that if expenditures are supported by tribal resolutions they are prima facie proper and it becomes plaintiff's burden to demonstrate that they were improper.

The court adopts the latter test, which seems to respond most readily to the nature of the tribal IIM budgeting resolution and disbursement process. The method for disbursement of IIM funds was different in some fundamental ways from the mechanism for disbursing IMPL funds. First, while IMPL funds were within the immediate control of Congress, IIM funds were budgeted for and spent by the Tribal Council, with the approval of the BIA superintendent and final approval of the Secretary of the Interior. At the commencement of each fiscal year, an annual budget was approved governing the disbursements of IIM funds. Thereafter, IIM funds were appropriated through tribal resolutions in order to fund emergency or other unanticipated expenditures.

Plaintiff has pressed the argument, primarily through the testimony of Mr. Gillis, that the Tribal Council was coerced into making expenditures of money by the superintendents who attended Tribal Council meetings and that the members of the Council were disadvantaged because of their inability to speak English. This al-

**26.** The Termination Movement is discussed in Father Francis Paul Prucha, *The Great Father, The United States Government and the American Indians,* 1041–43 (University of Nebraska Press 1984); and Robert M. Kvasnicka & Herman J. Viola, *The Commissioners of Indian Affairs, 1824–1977,* 285 (University of Nebraska Press 1979).

leged inability to communicate in English apparently translates for plaintiff into a lack of responsibility for decisions made by the Tribal Council to expend IIM funds.

The record does not support plaintiff's contentions. First, the minutes of Tribal Council meetings, the text of tribal resolutions, and the direct testimony of former Superintendent Crow demonstrated that the budgeting process was a cooperative effort between the agency superintendent and members of the Tribal Council. Plaintiff has presented no viable evidence to suggest any coercion on the part of superintendents with respect to the Tribal Council's adopting or budgeting for either the annual tribal budget resolution or the additional tribal resolutions providing for IIM disbursements during the course of the year. Plaintiff argues that the superintendent and the Secretary of the Interior retained the power to veto disbursements and that this power amounted to control over the spending of IIM funds. To the extent that this power specifies any control, it merely represents the authority to prevent spending, rather than the authority to spend—two powers that are vastly different when it comes to accounting retrospectively for the disbursement of funds.

Important as well is plaintiff's contention that members of the Tribal Council were unable to communicate in English. Even if this were the case, the court considers that this impediment would not relieve the Tribal Council of accepting the responsibility for its own expenditures of funds. However, the evidence does not portray the Tribal Council members as unable to communicate in English. In the March 1992 session of the trial, defendant presented minutes from Tribal Council meetings over the course of the entire time period during which the challenged IIM expenditures took place. The record revealed that members of the Tribal Council spoke English. Plaintiff has introduced a voucher for the employment of an interpreter. Defendant rejoined that the interpreter was hired for the purpose of providing interpretation to the one Tribal Council member who, at that time, did not appear to have command of the English language.

The Tribal Council had the initial responsibility to determine what types of projects could or would be funded by IIM funds. The superintendent assisted the Tribal Council in this effort. No evidence indicates that the vetoing of budget resolutions occurred more often than extremely infrequently. At any rate, it is not enough to shift the responsibility for this expenditure to the Government and compel the Government to demonstrate that the expenditure was reasonably calculated to benefit the tribe, applying the *Te–Moak Bands* test for evaluation of disbursements, as was done in the case of IMPL disbursements.

Mr. Gillis testified that he used codes in his analysis of IIM expenditures, but not primarily to establish that they should be disallowed. Rather, as the witness stated, he was "simply trying to bring some order out of the chaos and present a classification that would enable one to begin to comprehend massive documentation and perhaps later make a determination since much of this is legal as much as it is substantive...." The codes were, as follows:

Code 1—Government or agency purpose
Code 2—Illegible or detail not identified
Code 3—No indication of purpose
Code 4—Voucher missing
Code 5—Individual benefit
Code 6—Mixed benefits
Code 7—Government obligation which would be related to the Colyer Agreement
Code 8—Refunds
Code 9—Not a tribal benefit
Code 10—Tribal versus individual
Code 11—No approval by tribal council
Code 12—Tribal purpose indicated

On cross-examination Mr. Gillis testified that he had not used the tribal resolutions in performing his analysis of the propriety of IIM disbursements. He stated that his reason for disregarding them was that many of the disbursement documents failed to reference all of them. Reviewing the tribal resolutions would have been "an exercise in futility" in his opinion. Mr. Gillis testified further that he failed to examine

even those tribal resolutions specifically referenced in the disbursement documents. He suggested that in performing an audit, the primary reliance would be on the disbursement documents. The court deems the failure to examine any tribal resolutions or other narrative material as a serious omission on plaintiff's part.

It is clear that the tribal resolutions were an integral part of the IIM disbursements. The resolutions are indices of reliability where the disbursements are concerned. The failure to look beyond the disbursement documents is entirely consistent with plaintiff's erroneous belief that the tribe is required to study only those documents most accessible to it and not other documents that were cross-referenced and available to plaintiff, though admittedly less accessible. Moreover, as in the case of the IMPL disbursements, plaintiff failed to demonstrate consistency in the coding process. Had plaintiff examined the tribal resolutions and other referenced narrative material, plaintiff might have provided a more persuasive basis for disallowance of expenditures. As with the IMPL disbursements, plaintiff cannot claim that the sheer volume of documents provided in the context of a retrospective accounting defeats the "readily ascertainable" standard articulated in *Blackfeet*. The failure to examine the involvement of the tribe in authorizing the disbursements, vis-a-vis the tribal resolutions, strikes at the core of plaintiff's IIM claim and severely undermines it.

Plaintiff's failure to examine the IIM tribal resolutions seems particularly egregious when set against the testimony of Ms. Erbacher and Dr. Angel, who introduced numerous representative tribal resolutions justifying hundreds of thousands of dollars of IIM expenditures. Some of these resolutions included: using money from the sale of fishing permits to support the Williams Creek Fish Hatchery; expending IIM funds for the construction of an industrial fence around the Tribal Fair Building located on the fair grounds; spending money for the purchase of new automobiles for police use, as well as authorizing construction of a jail and employment of a jailer at Whiteriver.

Other representative tribal resolutions addressed: water facilities for livestock; the Old Folks Herd budget for 1947; purchase of registered cattle; increase of the 1948 budget to provide for unanticipated expenses; operation and upkeep of tribal-owned tractors; establishment of the revolving credit program; retention of attorneys for the tribe; salary of the Tribal Council Chairman; adoption of the Tribal Council budget for 1951; augmentation of the 1951 budget; funds for the Apache Mercantile Company; salaries of game wardens; funds for the White Mountain recreation enterprise; appropriation of the annual budgets for 1954, 1955, and 1956; forest fire suppression; funds to commission an aerial map of the reservation; predator control on the reservation; work projects on the reservation; construction of cottages for teachers; development of a water supply in Canyon Day village; and construction of a health facility at Cibecue.

Dr. Angel testified that he considered that the foregoing tribal resolutions were representative of the kinds of activities that the tribe was undertaking with respect to the expenditure of IIM moneys. On cross-examination the witness admitted that he did not ascertain on a dollar-by-dollar basis that the funds appropriated were actually expended. While he was unable to confirm, by looking at accounting records, that expenditures were actually carried out pursuant to the authorities, Dr. Angel did point out that by reading historical documents he was able to deduce that expenditures for which resolutions were adopted actually were carried out.

Dr. Angel's testimony echoed that of Ms. Erbacher, who testified regarding the pre-1946 IIM disbursements, as well as the organization of the IIM vouchers and workpapers.

The court finds that the tribal IIM disbursement process was inherently honest and reliable. It is the court's view that the standards that govern the acceptability of an IIM accounting may be different from those governing an IMPL accounting because a tribe exercises a higher level of

control over its funds. The volume of tribal resolutions authorizing expenditures is sufficient to establish that the tribe itself had control of IIM funds. No evidence surfaced that any of the superintendents coerced the Tribal Council so as to cause the Council to misspend the tribe's funds. The power that the superintendents exercised was merely the power to veto spending, not the power to spend. The same holds true for the power exercised by the Secretary of the Interior, who was required to approve or disapprove tribal disbursements following recommendations by the Tribal Council and the BIA superintendent.

At trial it was established that defendant was unable to provide documentation for more than $8 million of vouchers for IIM disbursements. This presents the court with a dilemma. Defendant candidly has admitted that more than $8 million of vouchers are missing. With the deductions made already for double counting from the Receipt Fund transfers and for the individual Stock Association Fund moneys, the amount of the missing vouchers, more than $8 million, exceeds $6,198,956.95, the amount that the court has found is at issue following the Fort Apache Stock Association and Disbursement/Receipt Fund deductions. Despite plaintiff's failure of proof on the IIM claim, the first responsibility in rendering an adequate accounting rests with the trustee, the Government. Although plaintiff forfeited its right to a supplemental accounting, the documentation provided by defendant is inadequate because it cannot account for $8 million in missing vouchers. Because defendant did not establish at trial whether and what portion of the missing vouchers would be found in the moneys disbursed from the Receipt Fund to the Disbursing Fund, the court finds that the Government has failed in its duty as trustee to provide documentation that would allow plaintiff to readily ascertain if the trust had been faithfully carried out. Plaintiff therefore takes $6,198,956.95 on its IIM claim.

27. The court awarded $5,424,429.00; $33,000.00 was deducted to avoid duplicate recovery by the

## CONCLUSION

Accordingly, based on the foregoing, plaintiff is entitled to judgment on all of its resource mismanagement and accounting claims in the total amount of $14,386,470.32, as follows:

1. Per the February 6, 1987 opinion on plaintiff's claim for resource mismanagement, *White Mountain Apache Tribe*, 11 Cl.Ct. at 681, $5,391,429.00.[27]

2. Per the February 20, 1992 opinion on three of plaintiff's accounting claims, *White Mountain Apache Tribe*, 25 Cl.Ct. at 342, $892,496.00.

3. On plaintiff's claims relating to IMPL disbursements, $1,903,588.37, with interest consistent with the May 9, 1990 opinion, *White Mountain Apache Tribe*, 20 Cl.Ct. at 377–78.

4. On plaintiff's claims relating to IIM disbursements, $6,198,956.95.

The Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.

The attention of counsel for plaintiff is directed to General Order No. 4.

February 20, 1992 opinion, *White Mountain Apache Tribe*, 25 Cl.Ct. at 342.